HIRAM HOLLEY AND WIFE *v.* ELI J. HAWLEY, GEORGE B. HOLLEY AND DUNCAN McDONALD.

*Tenants in Common.    Adverse Possession.    Ouster.*

It is well settled that where there is no adverse holding, the possession is considered as following the property, and is deemed to be in him who has the title.

Also that when one joint owner is in possession of the whole, the presumption is that he is keeping possession not only for himself but for his co-tenant, according to their several rights, and the other joint owner or owners have the right to so understand, until they have notice to the contrary.

A joint tenant or tenant in common, has a right to suppose that by a deed of his co-tenant, in which the land is described so as to pass the whole under the deed if the grantor had owned the whole, both the grantor and grantee understood it to convey the real interest the grantor owned in the land.

The taking of a deed by one tenant in common from a third person and spreading the same upon the record, would have no effect towards constituting such an *ouster* of his co-tenant as would lay the foundation for the commencement of an adverse possession against him, unless accompanied and followed by a hostile claim of which the co-tenant had knowledge, and by acts of possession not only inconsistent with, but in exclusion of, the continuing right of the co-tenant in the premises.

The building of the fence about the demanded premises, in the manner and for the purposes stated in the opinion in this case, by Bloomer, did not tend to show that he was claiming them adversely to the title of Gray, his co-tenant.

The notice of one co-tenant to another that the former is claiming and holding the whole interest adversely to the interests of the latter, should be sufficiently explicit to give the latter to understand that the former will no longer keep possession for the latter, and that he claims and holds the entire premises against the latter, and to impose upon the latter the necessity of protecting his interests by that measure of diligence which the statute of limitations requires.

A. and B. became owners and tenants in common of a certain quarry lot in 1817. In 1834 B. quit-claimed to his son C. with two other parcels of land.   In 1837 H. deeded to C. certain premises, containing thirty-two acres including in said description said quarry lot.   In 1863, C. deeded said lot to the defendants.'   C. testified that in 1838 he fenced a small piece including said lot for the purpose of turning in his horse and kept it enclosed, and quarried on it in 1838, and not again until 1853; that since 1837, he claimed to be the sole owner, and never recognized any right in A.; that he never knew of his father's deed to him until

a month after it was executed; that he paid no consideration for it; that his father told him what disposition to make of it; that his father at the time was confined to jail limits and his land under attachment; that he disposed of the several parcels as directed by his father; that he never made any claim to the lot under that deed except as his father directed him to dispose of it; that he never occupied the lot until he got his deed from H.; that he never held the land conveyed to him by his father for his own benefit, but for the benefit of those to whom his father directed him to convey it; that he did not know who took said deed to be recorded. C.'s deed from H. was duly recorded. H. occupied said thirty-two acres while he owned them, except the quarry. It did not appear that A. ever heard that C. claimed the whole lot against A. *Held*, that A. and C. were tenants in common, and that the testimony did not tend to show that C., during the life of A., who died in 1848, commenced an adverse possession against A.

EJECTMENT for the recovery of a parcel of land in Dorset. The plaintiff's seizen was laid April 1st, 1862; the *ouster* of the defendants April 2d, 1862. The damages demanded were $2000. The plaintiffs' writ was dated May 23d, and served May 24th, 1865. Plea, the general issue, and trial by jury at the June Term, 1866, KELLOGG, J., presiding.

The deeds introduced on trial showing the paper title to the demanded premises, were as follows, viz: Isaac Manley to James G. and William Stewart, dated September 30th, 1800; James G. Stewart to William Stewart, dated May 11th, 1807; William Stewart to Robert Bloomer, William Farnsworth and Elijah Sykes, dated November 28th, 1808; Elijah Sykes to Robert Bloomer and William Farnsworth, dated June 18th, 1809; William Farnsworth to John Gray, dated August 16th, 1817; Robert Bloomer to Robert P. Bloomer, dated June 13th, 1834; Isaac Manley to Harvey Holley, dated July 18th, 1835; Harvey Holley to Robert P. Bloomer, dated June 6th, 1837; Robert P. Bloomer and Wife to the defendants, dated September 1st, 1863.

Clarissa, the *feme* plaintiff, daughter of John Gray, married the plaintiff, Hiram Holley, August 9th, 1824. John Gray died September 30th, 1848. The other material facts sufficiently appear in the *syllabus* and in the opinion of the court.

Upon the testimony of Robert P. Bloomer, the defendants claimed that, as against the plaintiffs, and all persons claiming under or in

the right of John Gray, Robert P. Bloomer had acquired, at the time of his conveyance to the defendants, a good and valid title to the premises described in the plaintiffs' declaration by adverse possession, and that the jury should, on this ground, be directed to return a verdict in favor of the defendants. The court ruled and instructed the jury in accordance with this claim, and, under the direction of the court, the jury returned a verdict for the defendants. To the said ruling and direction to the jury the plaintiffs excepted.

*G. W. Harmon* and *E. B. Burton*, for the plaintiffs.

*A. L. Miner* and *D. Roberts*, for the defendants.

The opinion of the court was delivered by

WILSON, J. The plaintiffs, by this action, seek to be let into possession of the demanded premises, as tenants in common with the defendants. The general question in the case is, whether the statute of limitations commenced running against John Gray during his life. It appears that, in 1817, John Gray (under whom the plaintiffs claim) and Robert Bloomer became the owners, and tenants in common of the land in question, and they continued to own the premises, as tenants in common, until Robert Bloomer conveyed his title and interest in the premises to his son, Robert P. Bloomer, by deed, dated June 13th, 1834, and recorded September 30th, 1835. It appears that Harvey Holley, on the 6th of June, 1837, executed his warranty deed to Robert P. Bloomer, purporting to convey to him certain land therein described, the boundaries of which, as stated in the deed, include the quarry and lot in controversy. Gray died on the 30th of September, 1848, and at the time of his death, he owned one undivided half of the premises. Robert P. Bloomer occupied the premises, under his deed from Robert Bloomer, or under his deed from Harvey Holley, or under both deeds, until September, 1863, when he conveyed the same to the defendants. The plaintiffs claim that Robert P. Bloomer, under whom the defendants claim title, derived his title to the quarry lot by the deed from his father, Robert Bloomer, dated June 13th, 1834; that by force of this deed Robert

P. Bloomer became a co-tenant with John Gray, and that the entry and possession of the quarry lot, by Robert P. Bloomer, should be referred to and treated as under this deed for himself and Gray as tenants in common. The defendants claim—1st. That Robert P. Bloomer never claimed title under the deed from his father Robert Bloomer, and did not take possession under that deed. 2d. It is claimed by the defendants that Robert P. Bloomer derived his title from Harvey Holley under his deed of June 6th, 1837, that he took possession and occupied the premises under this deed, and made claim thereto in his own right and adverse to the title of Gray, and the defendants deny that Robert P. Bloomer was, or that he ever claimed to be, a co-tenant with Gray. No question is made but that the deed from Robert Bloomer to' Robert P. Bloomer was, upon its face, as between the parties thereto, sufficient in form and substance to convey the estate therein described, and to constitute Robert P. Bloomer a co-tenant with Gray. But the defendants say that, in view of the circumstances under which this deed was executed, Robert P. Bloomer, the grantee, could not safely claim title under it, that consequently he did not claim the premises, nor take possession of them until he made the purchase of Harvey Holley in 1837. This leads us to consider the several objections urged by the defendants' counsel, to the deed from Robert Bloomer to Robert P. Bloomer, so far as it is claimed they have a bearing upon the question whether he claimed title to the quarry under this deed, or under the deed from Harvey Holley, and upon the question as to which of these deeds his possession should be referred.

The defendants say, in relation to the deed from Robert Bloomer to Robert P. Bloomer: 1st. That it was executed without the knowledge of Robert P. Bloomer. 2d. That it was executed without consideration. 3d. That it was fraudulent as to the creditors of Robert Bloomer. 4th. That Robert P. Bloomer never claimed under it, in his own right; and 5th, that he did not take possession of the premises under this deed. In regard to Robert P. Bloomer's knowledge of the execution of the deed, he testified that he had no knowledge at the time the deed from his father was executed; that after his father executed the deed he told the witness what disposition

to make of the property ; that his father informed him about the deed within a month after it is executed ; that the witness took the deed, but could not tell who carried it to the clerk's office to be recorded.　The testimony of this witness leaves no doubt that his father intended, by the deed, to convey the premises to the witness ; and that the witness, when informed of the existence of the deed, accepted a delivery of it, and acted under it.　As to the cosideration upon which the conveyance was made, whether Robert P. Bloomer did or did not pay or agree to pay for the land, was not essential to the validity of the deed as between the parties thereto.　It does not appear that any question was ever made as to his title by the creditors of Robert Bloomer, on the ground that the conveyance was not founded upon a valuable consideration.　In respect to the question whether the deed was fraudulent as to the creditors of Robert Bloomer, it is sufficient to say, that there is nothing in the case which tends to show that his creditors ever claimed to hold the quarry lot against the title of Robert P. Bloomer, under the deed from his father.　But if they did make such claim it would seem that Robert P. Bloomer satisfied the claim of such creditors, by conveying to them the other lands embraced in the deed, and this conclusion is strengthened by the fact that Robert P. Bloomer was suffered to hold the title to the quarry lot, without molestation from, or interference on the part of such creditors.　In regard to the claim made by Robert P. Bloomer, under the deed from his father, the witness testified that he followed his father's instructions, and deeded the different parcels of land as he directed.　It must be conceded that, to the extent of these conveyances, Robert P. Bloomer must have claimed under the deed, according to its legal effect, and that he made such claim under this deed, and executed such conveyances in his own name as were necessary to transfer valid titles to the lands by him conveyed.　The witness further testified that he made no claim under the deed from his father, to the ownership of the quarry lot only as his father directed him to dispose of it.　But it does not appear that the witness conveyed the quarry under the direction of his father, nor does it appear that he reconveyed, or agreed to reconvey the quarry lot to his father.　It appears then, from the deed and from the testi-

mony of this witness that he had, from the 13th of June, 1834, to the 6th of June, 1837, a perfect title to one undivided half of the quarry lot, under the deed from his father.    It is urged by the defence, and the witness testified he did not hold the property for his own benefit but held it for the benefit of the persons to whom his father directed him to convey it.    This objection to the title and claim of Robert P. Bloomer, under the deed from his father, has no force against the alleged relation of Robert P. Bloomer as co-tenant with Gray, for the obvious reason that the deed upon its face, and by its terms, conveyed the interest and estate of the grantor to Robert P. Bloomer, in his own right.    The deed declared no trust, the record of the deed furnished no evidence that Robert P. Bloomer held the land in trust, and it does not appear that Gray ever had notice that Robert P. Bloomer claimed to hold the quarry as trustee of his father.    And for the same reason the circumstances under which it is claimed the deed was executed, the alleged want of consideration, and whether the deed was fraudulent as to the creditors of Robert Bloomer, were matters entirely extraneous, and the record of the deed furnished no notice of them to Gray, nor to any other person.    It does not appear that there was anything in the title of Robert P. Bloomer, under the deed from his father, or in the manner he claimed under it, calculated to lead any one to suspect Bloomer did not claim under this deed.    If Gray examined the record of this deed he must have supposed that Robert P. Bloomer had become a tenant in common of the premises, and the record furished no evidence that he claimed otherwise or under a different title.    It is further urged by the defendants that Robert P. Bloomer did not take possession of the lot until he took it under his deed from Holley.    The witness testified that he did not occupy the quarry lot until he got the deed from Holley.    But if Robert P. Bloomer was not in possession of the quarry lot from the time he took the deed from his father, June 13th, 1834, to the 6th of June, 1837, who was in possession of it?    Bloomer testified that Harvey Holley did not occupy the lot at any time during that period, and there was no evidence in the case that any one was in possession of the lot holding or claiming to hold it adverse to Robert P. Bloomer.

It is well settled that where there is no adverse holding, the possession is considered as following the property, and is deemed to be in him who has the title. Prior to the Holley deed Robert P. Bloomer had title to the quarry lot, as tenant in common, and he had such possession under his title as has always been held sufficient to enable one to maintain trespass *quare clausum fregit.* It is well settled that when one joint owner is in possession of the whole, the presumption is that he is keeping possession not only for himself but for his co-tenant, according to their several rights; and the other joint owner or owners have the right to so understand, until they have notice to the contrary. *Roberts, Adm'r,* v. *Morgan,* 30 Vt. 319; *Leach* v. *Beatties,* 33 Vt. 195. The defendants do not claim that a sufficient foundation was laid for the commencement by Bloomer of an adverse possession against the title of Gray, prior to the Holley deed; but they claim that the deed from Holley to Robert P. Bloomer, purporting upon its face to convey the whole premises, was such an assertion of title to the whole quarry lot, as to be notice to Gray, the other tenant in common, when recorded, that Bloomer under this deed claimed title to the entire quarry lot, and create such an *ouster* of Gray, and the commencement of an adverse possession against him, commenced in his life time, which continued fifteen years, would bar his right. This deed alone did not create such an *ouster* as Gray was bound to notice or treat as the commencement of an adverse possession against him. In *Roberts, Adm'r* v. *Morgan,* 30 Vt. 319, the court held that a conveyance by one joint tenant, or tenant in common, of all his interest in real estate, though the land is described in such a manner as to pass the whole under the deed, if the grantor had owned the whole, is not notice of itself to the other joint owner of any such exclusive claim to the land, as to *oust* him of his legal seizen in the land. He has a right to suppose that by such a deed both the grantor and grantee understand it to convey the real interest the grantor owns in the land. He may treat the possession of the grantee under such a deed, until notice to the contrary, as a holding by the grantee in his character and right as a tenant in common with the other joint owner of the premises, and for their mutual benefit. Nor can we upon any principle hold that

the taking of a deed by one tenant in common, from a third person and spreading the same upon the record, would have any effect towards constituting such an ouster of his co-tenant, as would lay the foundation for the commencement of an adverse possession against him, unless accompanied and followed by a hostile claim of which the co-tenant had knowledge, and by acts of possession not only inconsistent with, but in exclusion of the continuing right of the co-tenant in the premises. It does not appear, nor is it claimed, that Bloomer, in the deed from Holley, purchased in an outstanding title, therefore it is not necessary to consider his right or the duty of his co-tenant under such a purchase. In applying these remarks to the present case we are brought to the conclusion that in order for the deed from Holley to Robert P. Bloomer to have any effect towards constituting an *ouster* of the co-tenant Gray, it was necessary that Gray should have had knowledge of its existence, and knowledge that Bloomer was making under it exclusive and hostile claim to the entire quarry lot.

The mere fact that a deed from Holley to Robert P. Bloomer of the whole quarry lot was duly recorded, does not amount to notice to Gray of the existence of such a deed and of Bloomer's claim to the exclusive ownership of the entire lot. In *Leach* v. *Beattie*, 33 Vt. 195, the court held that the recording of such a deed would not affect the co-tenant with notice of the existence of such a deed, and, as a consequence, of a claim by the grantee to the exclusive ownership of the lot in question ; that such recording could be held to affect only persons who take conveyance of the same land subsequently thereto and not those who already have title. It is urged by the defendants that the character of Robert P. Bloomer's possession, after he took the deed from Holley, was according to this deed and not according to the deed from his father. The deed from Robert Bloomer to Robert P. Bloomer, described the premises as " being about one-half acre of land, called the Stewart Quarry." The deed from Holley to Robert P. Bloomer purports to convey a certain piece of land, " supposed to be thirty-two acres, be the same more or less," and the boundaries of the land are stated in the deed, It does not appear that the quarry was mentioned in the deed or description of the land, but Bloomer

testified that the description and boundaries of the thirty-two acres, given in the deed, included the quarry lot in controversy in this suit. Bloomer testified that he knew Harvey Holley occupied the premises while he had a deed of them. It would seem from the testimony of the witness that the idea he intended to convey and did convey, as to the occupancy of the premises by Harvey Holley, was that Holley occupied the premises, excepting the quarry. This clearly appears to have been the meaning of the witness, for in another part of his testimony he says that " he, ( Harvey Holley,) did not occupy the quarry." The case does not show that Harvey Holley ever had any title to the quarry lot, or that he ever had possession of it. In respect to the occupancy of the quarry lot, by Robert P. Bloomer, after the date of the Holley deed, he testified : " I run a fence around the quarry so as to enclose about one and one-half acres, and the quarry was within the enclosure. There was a stone wall on the road side when I bought it. I made the fence to turn a horse in, or any thing I chose. The land was not fit to mow or plow. I made this enclosure, I think, within a year after I bought it, and kept it enclosed pretty much while I owned it. I used to put my calves there. The first quarrying I ever did there was in 1838, in the fall, and I don't recollect of quarrying there myself after that, until about the fall of 1853."

The testimony of the witness above detailed embraces the substance of all he said as to his occupancy of the quarry and the character of his occupancy during the life of Gray. We think these acts of occupancy, considered independent of any declaration by Bloomer that he claimed title to the whole lot against Gray, are consistent with his title under the deed from his father. It does not appear that he performed any labor on or about the premises which a tenant in common, keeping the possession for himself and his co-tenant might not lawfully do. As to the building of the fence, Bloomer testified there was a wall on the road side of the quarry prior to his deed from Holley, and whether he so built his fence as to enclose the quarry in his pasture, because it was less expensive than it would have been to have excluded the quarry, does not appear. But we think his description of the location of the fence, and the manner in

which it was built, taken in connection with his testimony as to the purpose for which he built it, and the purpose for which he occupied the lot, did not tend to show that he was claiming the quarry adverse to the title of Gray. It is said by the defendants that the possession of Bloomer was under a claim to the whole lot. Bloomer testified that he claimed to be the " owner and sole owner of the premises, and that he never recognized any right in John Gray or his estate, to any claim there." But the testimony does not disclose when Bloomer made such claim, nor does the testimony disclose the circumstances under which such claim was made, nor the manner of making it, nor does it appear to whom he ever disclosed that he was claiming the whole lot, adverse to the interests of his co-tenant. And it is clear that it does not appear from the testimony, that Bloomer ever made such claim, in the lifetime of Gray, consequently no inference could be drawn from the testimony that Gray ever heard as much as a rumor that Bloomer claimed the whole lot against his co-tenant. In order for the statute to begin to run against Gray in favor of his co-tenant, Bloomer, there must be what the law will regard as an actual *ouster*. The Holley deed, without notice to Gray of its existence and without notice to Gray that Bloomer claimed under it the whole premises, in exclusion of Gray, had no tendency to constitute such an *ouster*. In *Roberts, Administrator*, v. *Morgan*, 30 Vt. 319, as to what would constitute sufficient notice by one tenant in common to his co-tenant, of the commencement of an adverse possession, the court say, "we consider the principle substantially the same as between landlord and tenant, as to converting a mere fiduciary possession into an adverse or hostile one." There can be no doubt that the notice should be sufficiently explicit to give the co-tenant, against whom such adverse and hostile claim is made, to understand that the tenant making such claim will no longer keep possession for his co-tenant, and that he claims and is holding the entire premises against his co-tenant, and to impose upon the co-tenant the necessity of protecting his interests, by that measure of diligence which the statute of limitations requires. In this case Gray having no notice of the hostile intentions of his co-tenant, might legitimately treat the claim and possession of Bloomer as

made and enjoyed under the deed from his father. In the absence of notice to the contrary, Gray might well suppose that Bloomer claimed under a deed which gave him title to the quarry, and not under a deed which gave him no title thereto. We think the testimony in this case did not tend to show that Bloomer, during the life of Gray, commenced an adverse possession against his co-tenant, and that the instructions given to the jury were clearly erroneous.

The result is that the judgment of the county court is reversed and the cause is remanded.