## HENRY SMITH *v.* HAMAKUA MILL COMPANY.

### EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

SUBMITTED APRIL 9, 1904.           DECIDED MAY 27, 1904.

FREAR, C.J., GALBRAITH AND PERRY, JJ. ·

Declarations against interest by an alleged adverse possessor of land are admissible to show the nature of the possession.

It is of the essence of adverse possession that it should be hostile and that the circumstances of the holding be such as to give the true owner notice, at least if he paid attention to his rights, that the possession is under claim as owner; and if the possessor so conducts himself towards the true owner as to lead him to believe that the possession is in subordination to his title, the elements of hostility and openness are lacking and the possession is not adverse.

The evidence in this case held sufficient to support a finding that the alleged adverse possession was not hostile for a portion of the necessary statutory period or the conclusion that such possession was not shown to be hostile for such portion of the period to the satisfaction of the jury.

Under C.L., §2113, kindred of the half blood of the intestate who are not of the blood of the ancestor are excluded from the inheritance, not only as against the kindred of the whole blood in the same degree who are of the blood of the ancestor but also as against the remoter kindred who are of such blood.

Kailakanoa, a konohiki whose name appears in the Mahele Book of 1848, died intestate in 1856 without having obtained an award for the land and without having alienated her right or estate, if any,

therein. Huakini, her sole heir, died in 1860, intestate and, similarly, without any attempt at alienation. In 1862, the Minister of the Interior issued, under the Act of 1860 for the relief of konohikis, an award for the land in the name of Kailakanoa. Held, that the award inured to the benefit of the heirs of Kailakanoa, that is, of those who would have inherited the land from her if the award had been issued in her lifetime; and that, in ascertaining who such heirs were, a half brother of Huakini not of the blood of Kailakanoa must, under the proviso of section 2113, be excluded in favor of the remote kindred of Huakini who were of the blood of Kailakanoa.

#### OPINION OF THE COURT BY PERRY, J.

For past history of this case, see 13 Haw. 245, *Ib.* 716, and 14 Haw. 669. The case is now here on defendant's exceptions taken at the third trial.

At the close of the evidence the defendant moved that the jury be directed to render a verdict in its, the defendant's, favor, upon the ground, among others, "that upon the undisputed and uncontradicted facts shown by all the evidence in said cause, the defendant's defense of the statute of limitations was and is fully sustained, both in fact and in law," and after verdict moved, on the same ground, for judgment *non obstante veredicto.* Both motions were denied and exceptions allowed to the rulings. Whether or not an exception was noted to the verdict before the discharge of the jury, is disputed. It may be assumed, in view of the conclusion reached by us on the merits, that such an exception was duly noted or that, if it was not, the question of the sufficiency of the evidence to support the verdict on the issue of adverse possession is presented by the other exceptions just referred to.

At the trial the plaintiff adduced evidence tending to show, as it is claimed, that the paper title to an undivided one-fourth of the land of Koholalele, Hamakua, Hawaii, was in the plaintiff. The defendant then introduced evidence tending to show that since the date of the decree of January 1, 1871, by Chief Justice Allen, the defendant and its predecessors in interest have had possession of the whole ahupuaa adversely to the plaintiff

and those under whom he claims and since 1874, in which year
Huakini's widow, Hoomana, conveyed her one-half interest to
Paul Nahaolelua, adversely to all, the facts thus shown being
substantially the same as those proven at the second trial, a state-
ment of which is to be found in 14 Haw. 671, 672, 673. In re-
buttal, two witnesses Mrs. Kia Nahaolelua and D. Kahaulelio,
testified for the plaintiff. As at the second trial, undisputed evi-
dence required a finding that the defendant and its predecessors
in interest had, for a period of more than twenty years next
preceding the commencement of this action (service of summons
was made November 26, 1897), possession that was actual and
continuous; and as at that trial it seems to be conceded that since
December 2, 1878, the date of the deed from Kia Nahaolelua to
Widemann, that possession had all the elements of an adverse
holding. The plaintiff's contention now, as then, is that there
was evidence sufficient to support a finding that as against Ka-
pehe and the grandchildren of Kapau (plaintiff's predecessors in
interest) the possession of the Nahaoleluas was not hostile, open,
notorious or exclusive, and that these two men so acted towards
the parties just named as to lead them to believe that the pos-
session was on their behalf and not under claim of absolute own-
ership. In our opinion, the present contention is well founded.

Kahaulelio testified, in part, as follows:

"Q.   Do you remember the time that Kia Nahaolelua sold
this land, this Koholalele?

A.   After the death of P. Nahaolelua, in September, 1875,
and somewheres in '76 or '77, Kia Nahaolelua disposed of this
land of Koholalele.

Q.   Did you have anything to do with that transfer?

A.   Before the land was disposed of, Kia Nahaolelua came
to me, acting as their attorney, to make out papers for the trans-
fer.

Q.   Please relate the conversation between yourself and Kia.
Nahaolelua?

A.   After the death of Nahaolelua and when it was ascer-
tained about a certain heir, then Kia Nahaolelua came to me
and wanted to have this land disposed of. So I advised him
that I thought it was not proper for him to sell the land now,

inasmuch as there were heirs to the property,—well, blood relations to the property.  And for the reason if he sold, why it would raise a disturbance, and for that purpose I advised him not to do it but rather to sell, if any to sell what you call the interest of the old man, P. Nahaolelua; so after that we parted and sometime afterwards I heard that the land was disposed of.

Q.    What did he say when you told him—spoke to him in this way,—when you said there were other blood relatives?

A.    He said that, 'Never mind' or 'Never mind about that.' He says 'Let me sell it and they can fight for themselves.'  And I told him that I couldn't do that.

Q.    How did you come to say that there were other blood relatives who had an interest in this land?

A.    While I was his private secretary I used to have charge of sums of money.  One was the Koholalele money, another was church funds, another was government funds, and moneys belonging to the chiefs, for their lands on Maui.  Somewheres in '69, '70 or '71 I asked him in reference to the Koholalele funds and he told me that he was partly interested in that money but there were also some blood relatives that were interested in that money also, and during '72, '3 and in fact at the election of the King, King Kalakaua, what you call—there was a supposition that P. Nahaolelua would be taken away from Lahaina; that is, he would cease to be governor to be brought down here, and then we had further talk on the subject of this money and still he told me that there were other blood relatives that were interested in it.

Q.    But he didn't say who their names were?

A.    Yes, he didn't say who their names were.

Q.    Did you know Kapehe, a relative of Nahaolelua?  Did you know Kapehe?

A.    I saw Kapehe during—about that time, '70 or '71 or between that, in Lahaina.

Q.    Living where?

A.    Lived with the governor sometimes, P. Nahaolelua, and sometimes with another gentleman up there by the name of Kawehi.

A.    I told him at the time not to have anything to do with the sale of it, and also advised him that there were others making claims to the land and who were heirs also, and if he should make any sale whatever it would lead him into trouble, pilikia.

Q.    But he paid no attention?

A.    Paid no attention to it.

Q.   How long ago was this conversation that he has just been relating?

A.   The conversation between Kia was after the death of Nahaolelua, '76, '77, somewheres around there, but the conversation—

Q.   About '76?

A.   About '76, somewheres around there, but the conversation with Nahaolelua, P. Nahaolelua, was somewheres about '69 or '70, somewheres around there."

Mrs. Kia Nahaolelua gave the following testimony:

"Q.   Mrs. Nahaolelua, are you the widow of Kia Nahaolelua, the son of P. Nahaolelua?

A.   Yes, sir.

Q.   Or the adopted son of P. Nahaolelua. I will show you —show the witness Exhibit 'C', deed from——'6', deed from Kia Nahaolelua and wife to H. A. Widemann, and ask the witness if that is your signature to that deed?

A.   Yes, that is my handwriting.

Q.   And you acknowledged that deed before Judge Fornander?

A.   Yes.

Q.   Why was there that long delay between the time your husband signed and the time you acknowledged that deed?

A.   Because I didn't want to sell the land.

Q.   Then please state what was said between Kia and yourself?

A.   He wanted to sell the land but I wouldn't agree to it, but he says 'we better sell the land and get the money, because there are heirs that will come in by and by'; he says, 'and if we don't sell it now we will have to fight with the heirs.' So I says, 'Well, I don't agree to that. I will wait a little while and I see; if I make up my mind I will sign the deed.'

Q.   What word did he use for heirs? Did he talk Hawaiian or English to you?

A.   He talked Hawaiian, some times in English.

Q.   What was the word 'heirs' in Hawaiian?

A.   Pili koko.

Q.   And you finally signed?

A.   After a long time, then I signed it.

Q.   Did you ever know Kapehe?

A.   Yes.

Q.   Where did Kapehe live?

A.   In Honolulu.

Q.   Where in Honolulu?

A.   In the palace.

Q.   Do you know how she came to live in the palace?

A.   I think the old governor put her there.

Q.   What old governor?

A.   Nahaolelua.

Q.   What makes you think so?

A.   Because I heard them—I heard him say that.

Q.   You heard him say that?

A.   Yes. Well, he and his wife together. The old gentleman and his wife.

Q.   Did you ever see Kapehe in Honolulu?

A.   Yes, sir.

Q.   Where?

A.   In Queen Emma's yard.

Q.   When?

A.   When the governor comes down to Honolulu.

Q.   By 'Governor' you mean Nahaolelua?

A.   Nahaolelua. And we often stayed there with Queen Emma's mother.

Q.   Did you ever see any transaction between Nahaolelua and Kapehe?

A.   I know before he goes to Lahaina he—he gives her money.

Q.   Did you see it yourself at any time?

A.   Only that time I was there; at that time when the Governor was there.

Q.   You saw that with your own eyes?

A.   I saw it with my own eyes, but I don't know what is the money for.

Q.   Did you ever see any transaction between Kia and Kapehe?

A.   After the Governor's death.

Q.   About what year was that, that you saw——?

A.   It is '70, '76 I think, and we go back and forward from Lahaina to Honolulu. I think it must be in '76 or right after Nahaolelua's death in '75.

Q.   What did you see then?

A.   What did I see then?

Q.   Yes, at that time.

A.   I saw my husband give Kapehe some money.

Q.    How much—what kind of money was it, do you remember?

A.    I think it is in silver, silver money.

Q.    How much; do you know how much?

A.    I think it is about twenty-five dollars.

Q.    Did you hear any of the conversation between the two?

A.    No.

Q.    Did you ever have anv conversation with Kia about Kapehe?

A.    Yes.

Q.    What was that conversation?

A.    About the money. I asked him what made him give her the money.

Q.    Where was this? When was that?

A.    That was here.

Q.    I mean when your talk—when you had your talk with Kia, when was that?

A.    Well, long after that; long after he gave the money.

Q.    What was the occasion of your talk with him about it?

A.    Well, he spoke about selling the land.

Q.    Yes.

A.    And I asked him what he want to sell the land for, and he says, 'Well——

Q.    In that conversation that you had before, what else, was there, if anything, said?

A.    Well, he said he gave the monev to her to give her—keep her quiet.

Q.    And when was this conversation?

A.    Well, I couldn't exactly say when, but it was along— It is about two months, I think, after that.

Q.    Two months after that?

A.    I think so. After he gave the money to her.

Q.    Well now, going on to the time that you have mentioned, the talk with your husband Kia Nahaolelua about the $25 to keep Kapehe quiet, do you think on looking back, do you think that that talk was before Kia had sold the land or after he sold it to Mr. Widemann? Which should you say?

A.    Before the land was sold.

Q.    And everything that you have referred to was before the sale?

A.    Before the sale.

Q.    Well, was it after Kia had signed but before you signed?

There was some considerable time, you know, between. What do you think about that?

A. I think it was long before I signed.

Q. Before you signed?

A. I think it was long before that.

Q. You think it was after Kia had signed?

A. I think the deed was made in seventy—1878 or '77, I don't know which. Yes, it was before the sale, I remember that.

Q. You have testified here, I believe, that upon one occasion you saw old Governor Nahaolelua giving Kapehe some money but you don't know what it was for?

A. I didn't know what it was for.

Q. Did you see what the money was; how much it was or anything of that sort?

A. Well, he put his hand in his pocket and gave it to her, but I don't know how much he had in his hand. I saw him give her the money with my own eyes, but I don't know how much money he had.

Q. Isn't this true: that any Hawaiian that was with Nahaolelua who was in need of money, if he had it in his pocket he would give it to her; wasn't that the old Governor? Wouldn't he do that way?

A. Yes, but he had a habit of giving this old lady always.

Q. Well, a good many others too?

A. And others too, and others too.

Q. That was the old Hawaiian fashion?

A. Yes, that is the old Hawaiian fashion."

Where testimony or the statements of parties as testified to by witnesses are reasonably capable of more than one construction, the jury alone is to determine the meaning intended to be conveyed by the witness or the party as well as the credibility of the witness and the inference to be drawn from facts proved where more than one inference may be so drawn reasonably. Some of Kahaulelio's testimony concerning the rents of Koholalele while capable of the construction that Kia Nahaolelua made the statements testified to is also capable of the construction that it was Paul Nahaolelua who made such statements. So also as to Kia's declaration to his wife that the object of the payment of money by him to Kapehe was to "keep her quiet".

From that the jury might have found that all that Kia meant was that Kapehe might set up or had set up an unfounded claim to the land which he, Kia, did not recognize and that the gift of money had been made simply for the purpose of keeping her in a friendly state of mind and render her unwilling to seriously assert her claim and without any intention on his part of recognizing her claim or of leading her to believe that he did recognize it in any way. On the other hand the declaration, taken in connection with Mrs. Nahaolelua's testimony concerning the time and the circumstances under which it was made, was also capable of the construction that Kia believed that Kapehe had a valid claim and feared that she might assert it and therefore gave her the money so as to lead her to believe and leading her to believe that it was a portion of the rent of the land and in that way misled her into thinking that he was not holding adversely to her. Similarly, it was for the jury to say, upon the evidence, who it was that Paul and Kia referred to when they spoke of the "blood relatives." Bearing in mind, then, the rule above stated as to the province of the jury in the matter, there was evidence which could legally have justified the jury in finding that both Paul and Kia Nahaolelua were aware of the fact that Kapehe had an interest in the land and by their acts and words led her to believe, as late as 1876, that their possession was not hostile to her but with recognition of her interest or, in view of the fact that the law placed upon the defendant the burden of proving every essential element of adverse possession, in concluding that upon all the evidence the element of hostility during that period was not proven to their satisfaction. It is, of course of the essence of adverse possession that it should be hostile and that the circumstances of the holding be such as to give the true owner notice, at least if he paid attention to his rights, that the possession is under claim as owner; and if the possessor so conducts himself towards the true owner as to lead him to believe that the possession is in subordination to his title, the elements of hostility and openness are lacking and the possession is not adverse. These findings could have been made even in spite

of the showing contained in the probate records of 1871 as to the presence of Kapehe on the witness stand in those proceedings and of the inference which was held, when the case was last before us, to be deducible therefrom that Kapehe was then aware of the extent of P. Nahaolelua's claim. That inference was rebuttable, as was clearly recognized in the former opinion in the statement that *"in the absence of any satisfactory showing to the contrary,* the only reasonable inference is that she knew that Nahaolelua was claiming to be heir to one half and that he recognized Hoomana only as the other heir." It is unnecessary to reconsider now the correctness of the ruling that under the circumstances stated that was the *only* reasonable inference. It is scarcely necessary to add that the question is not whether, if the trial were being held before us, we would find the evidence of Kahaulelio and of Mrs. Nahaolelua sufficient to rebut the *prima facie* showing of adverse possession made by the defendant or would, in view of such rebuttal testimony, conclude that the burden as to the elements of hostility and openness had not been successfully borne by the defendant, but merely whether reasonable men could reasonably, by legitimate inference from the facts proved, make such finding or thus fail to be satisfied as to the existence of those elements. There was, of course, evidence even by Kahaulelio and Mrs. Nahaolelua that would have supported a finding that the possession was in all respects adverse for the full statutory period.

Since, then, the evidence would support a finding of lack of hostility as late as 1876, there is nothing in the evidence to require a finding that the nature of the possession changed prior to December 2, 1878, the date of the deed from Kia Nahaolelua to Widemann. Possession once shown to have been at its inception permissive or in subordination to the true owner's title, is presumed, in the absence of any showing to the contrary, to continue of the same character,—in other words, the burden is on the possessor to show that it thereafter became hostile. This action was commenced less than twenty years from the date last mentioned. Upon the issue of adverse possession we think that the

verdict cannot be disturbed. It may be remarked that Kahau-lelio did not testify at any former trial and that the portion of the testimony of Mrs. Nahaolelua here discussed and relied upon was not given at the second trial.

The contention that the testimony concerning the statements by Paul and Kia Nahaolelua and the payments by them to Kapehe was inadmissible, cannot be sustained. Evidence of such acts and declarations by an alleged adverse holder, made against interest, are admissible to show the true nature of the possession.

Under certain of the exceptions it is further contended on behalf of the defendant that the paper title itself is in the defendant and that for this additional reason a verdict should have been directed for the defendant. The argument in support of this is two-fold: first, that Section 2113, C.L., excludes the kindred of the half blood not of the blood of the ancestor only as against those of the whole blood in the same degree and that, therefore, even if this was an ancestral estate coming to Huakini by descent from Kailakanoa, P. Nahaolelua inherited one half to the exclusion of the remoter kindred of Huakini (that Hoomana's one half is now in the defendant is not disputed in this case); second, that this inheritance did not come to Huakini by descent from Kailakanoa for the reason that the award was not issued until after Kailakanoa's death and that she did not have title to the land at her death.

C.L., §2113, reads as follows: "The kindred of the half blood shall inherit equally with those of the whole blood in the same degree; provided, however, that where the inheritance came to the intestate by descent, devise, or gift, of some one of his ancestors, all those who are not of the blood of such ancestor, shall be excluded from such inheritance." In a former opinion in this case we said, on this point: "Nahaolelua, then, could not inherit, for, although as a rule kindred of the half blood inherit equally with those of the whole blood under our statute, yet they are excluded when they are not of the blood of the ancestor through whom the inheritance came to the intestate by descent,

devise or gift."—13 Haw. 716, 717, 718. This is contended by the defendant to be *obiter dictum* and by the plaintiff to be the "law of the case" and not open to reconsideration at this time. It may be assumed for present purposes that the remarks just quoted were mere *dicta* and that the matter is now open for reconsideration.

The view expressed at the former hearing was reached only after careful consideration. With the benefit of the argument now presented for the defendant and of a re-examination of the subject, we are still of the opinion that that view is correct and that it was the intention of the legislature as expressed in §2113 to exclude all those of the half blood not of the blood of the ancestor not only as against those of the whole blood in the same degree but also as against those of the whole blood in a remoter degree. So far as the precise point under consideration is concerned, this seems to be the natural construction and the only construction possible without in effect adding the words "as against those of the whole blood in the same degree." The fear that the construction preferring the remoter kindred of the whole blood will lead to the exclusion of the widow, seems to us to be unfounded. The section was intended to make explicit provision as to the circumstances under which the half blood would or would not inherit and does not affect the rights, declared in other sections, of the widow who in any event is not of the blood of the intestate. The section first states the general rule that the half blood shall inherit *equally* with the whole blood, not more nor less nor under different circumstances, thus leaving the widow, if she would otherwise inherit, always provided for; and then adds that in the case of ancestral estates certain of the half blood shall not inherit at all. The language of the proviso is clear and does not permit of the limitation that it shall apply only as against those of the whole blood in the same degree.

Courts elsewhere are divided as to the construction to be given to similar statutes. Those of California, Michigan and, perhaps, Indiana support the view urged for the defendant; those

of Arkansas, Missouri, North Carolina, Alabama by *dictum,* and perhaps Wisconsin, the opposite view.   On whichever side the preponderance of authority may be,—in this connection it must be remembered that the various statutes differ in their language to a greater or less degree—the better reasoning seems to us to lead to the construction adopted by us.   It follows that, if this was an ancestral estate, P. Nahaolclua did not inherit from Huakini.

As to the second branch of the argument.   Kailakanoa died in 1856 and Huakini in 1860.   Neither obtained an award for the land.   The award was issued on January 15, 1862, by the Minister of the Interior under the authority conferred by the Act of 1860 for the "Relief of certain konohikis, whose names appear in the Division of Lands from Kamehameha III", Kailakanoa being a konohiki whose name appears in the Mahele Book of 1848.   The award so issued was in the name of Kailakanoa, as also was the Royal Patent for the same land issued on July 19, 1862.

The act just referred to authorized the Minister "to grant awards for their lands to all konohikis who have failed to receive the same from the Land Commission, provided that the names of such konohikis appear in the Mahele Book of the year 1848", and declared that all awards so granted should be "equally valid with those of the Land Commission".   It also required the Minister to publish notice "calling upon all konohikis, their heirs, executors and administrators, to present their claims on or before" a day named.   We think that the act shows upon its face that it was the intention of the Legislature that the awards authorized should be issued not only in cases where the konohiki was alive but also in those where the konohiki was dead and that in the latter class of cases the awards should be in the name of the original claimant.   Such, as we understand it, had been the practice of the Land Commission under similar circumstances and the same practice was prescribed, in the matter of the issuance of patents upon awards of the Land Commission, by the act of July 29, 1872, which provided: "Every Royal

Patent hereafter issued upon an award of the Board of Commissioners to Quiet Land Titles, shall be in the name of the person to whom the original award was made, even though such person be deceased or the title to the real estate thereby granted have been alienated."

It is contended, however, that an award to a deceased person is void. This award was issued, in form, as the law directed that it should be. It may be that, in substance, it can be sustained on the theory or fiction that it was intended to relate back to Kailakanoa's lifetime and that the title should be regarded as coming by descent from her to her heirs, or on the view that a konohiki whose name was in the Mahele Book of 1848 had, from the time of the entry in that Book until the issuance of an award, a right to or estate in the land which was descendible and which after the death of the claimant was confirmed and completed in the heirs by the issuance of the award. However that may be, we are of the opinion that it was the intention of the legislature, sufficiently expressed in the statute, that the benefit of the award should inure, in the case of a deceased konohiki who had not alienated his right or claim, to his heirs,—to those who would have taken as his heirs if the konohiki had received the award in his lifetime. The act of 1872, already referred to, expressly directed that all royal patents thereafter issued should "inure to the benefit of the heirs and assigns of the holder of such original award." This is not quoted as statutory authority for the view here adopted as to awards but merely to show that that view, one which, as we understand, has in practice been for a long period of years recognized, is the one adopted by the legislature in 1872 in the somewhat related matter of royal patents. In short, the position taken by the Land Commission and by the legislature in the acts of 1860 and 1872 was that it was not for the government or its authorized representatives to consider or to determine who were the alienees or the heirs of deceased konohikis, but that it would simply issue the awards or patents in the name of the original claimants and leave it to those claiming under the latter to determine subsequently, whether

with or without the aid of the courts, their respective rights as though acquired by descent or by deed from the awardee.

If this was what the legislature intended, there can be no difficulty in ascertaining, in the case at bar, who the persons were to whose benefit the award issued in Kailakanoa's name inured. If Kailakanoa had received the award in her lifetime, the title would, upon the undisputed evidence, have passed by descent to Huakini, her half brother, as her sole heir and from him by descent, one half to Hoomana, his widow, one fourth to Kapehe the second, daughter of Keaka, sister of Kapehe the first, the mother of Kailakanoa and Huakini and the remainder to other kindred of Huakini of the blood of Kailakanoa, to the exclusion of P. Nahaolelua who, while he was the half brother of Huakini, was not of the blood of Kailakanoa. Had the complete title vested in Kailakanoa by the issuance of the award to her in her lifetime, the proviso of §2113 would without doubt have applied and must likewise, in the view here expressed concerning the intention of the legislature, be applied in determining who the persons were to whose benefit the award inured.

Whether or not the subject last discussed is open to consideration upon the present bill of exceptions, need not be determined. We have assumed, in defendant's favor, that it is properly before us.

The exceptions are overruled.

*Kinney, McClanahan & Cooper* and *S. H. Derby* for plaintiff. *A. S. Hartwell* and *Cecil Brown* for defendant.