# BENJAMIN YIN AND ELIZA KAIMIHANA NAHOEU
## *v.* FRANK E. MIDKIFF, ET AL.

### No. 4984.

FEBRUARY 10, 1971.

RICHARDSON, C.J., MARUMOTO, ABE,
LEVINSON AND KOBAYASHI, JJ.

OPINION OF THE COURT BY RICHARDSON, C.J.

This proceeding was filed as a complaint to quiet title
to certain real property located at Keauhou, Kona, Hawaii,

consisting of three separate grants, to wit: portion of L.C.Aw. 7362, R.P. 8023, Apana 2 to Kaanoano (hereinafter referred to as Parcel I), portion of L.C.Aw. 11046, R.P. 4437 to Molale (hereinafter referred to as Parcel II), portion of L.C.Aw. 7713, R.P. 4475, Apana 7 to Victoria Kamamalu (hereinafter referred to as Parcel III), all totaling .61 acres. These three parcels have been surrounded by stonewalls since at least 1902 and contained a family dwelling, which straddled the boundary between Parcels I and III, as well as a cistern, privy, shed and storeroom.

The premises were owned by one Samuel Haanio at the time of his death in 1909.[1] He died intestate, a widower and childless, being survived by the three children of a predeceased brother, their names being Harry Haanio, Rachael Haanio Kaimihana (formerly Rachael Haanio Yin), and Alice Haanio Mia. All three subsequently died intestate and left various progeny surviving them, Harry being also survived by his widow, Mary Haanio.

Plaintiffs-Appellants, Benjamin Yin and Eliza Kaimihana Nahoeu, two of the children of Rachael Haanio Kaimihana, filed suit to quiet title. Mary Haanio, Harry's widow, and seven of her eight children filed a counterclaim and a cross-claim contending that they had acquired title to the property by adverse possession. Meanwhile, the eighth child of Harry, Lawrence Haanio, had died leaving a widow and two children, all of whom filed answers admitting the family pedigree and claiming only the interest that they would have as members of the family tree; *i.e.*, not joining in the claim of adverse possession. Essentially, therefore, we have a case in which plaintiffs are contend-

---

[1] Record title to Parcels I and II was vested in Samuel Haanio by recorded deeds in 1884 and 1894 respectively. Paper title to Parcel III was in Bishop Estate although the Bishop Estate Trustees realized in 1909 that the Estate had probably already lost its land by adverse possession. This was confirmed by the Podmore survey ordered by Bishop Estate in 1925.

ing that the respective issue, as a group, of each of said Harry, Rachael and Alice own an undivided one-third interest in the land. Defendants, on the other hand, are claiming full title for all of the heirs of Harry.

In the trial court defendants prevailed and were found to have acquired title to the premises by adverse possession. Judgment was filed in favor of the widow of Harry Haanio and all of his eight children and/or issue thereof, vesting full title in them, and against the various children of Rachael and Alice, first cousins of the children of Harry. Plaintiffs have appealed by alleging as error the trial court's findings of fact as to adverse possession and the court's conclusions of law.

What constitutes the essentials of adverse possession by one cotenant against other cotenants is of course a matter of law; whether those essentials are present in a given case, there being sufficient evidence in support of either conclusion, is a question of fact. The first part of this opinion will, therefore, address itself to defining the essentials of adverse possession in cases involving cotenants, particularly where the cotenants have close blood ties and are claiming title from a common source or ancestor. The second part will, in turn, examine the evidence presented in the trial court to determine whether its conclusions are consistent with the general propositions of law discussed herein.

## I. *Essential Requirements of Adverse Possession— Cotenants*

. This is a case involving cotenants: a brother, Harry, and two sisters, Rachael and Alice. They are today represented by the widow and children of Harry, who are the appellees, and the descendants of Rachael and Alice, who are the appellants. It is a case of aunt versus nieces and

nephews; a case of cousins versus cousins. No third parties are involved. The law and the necessary sufficiency of evidence in cases of cotenants, particularly where there are close blood ties, is very different from cases involving third parties.

That one cotenant may hold adversely to another cotenant is recognized in this jurisdiction. *Kaahanui* v. *Kaohi*, 24 Haw. 361 (1918); *Aiona* v. *Ponahawai Coffee Co.*, 20 Haw. 724 (1911); *Kauhikoa* v. *Hobron*, 5 Haw. 491 (1885); *Nahinai* v. *Lai*, 3 Haw. 317 (1871). And traditionally courts have held that a cotenant relying upon a claim of adverse possession has the burden to show the following essential requirements in order to acquire exclusive title as against the ones out of possession: (1) a clear intent to claim adversely; (2) adverse possession in fact; and (3) knowledge or notice of the hostile holding brought home to the cotenant or cotenants out of possession. *Chicago, P. & St. L. Ry.* v. *Tice*, 232 Ill. 232, 83 N.E. 818 (1908); *Waterman Hall* v. *Waterman*, 220 Ill. 569, 77 N.E. 142 (1906).

Although it is elementary that the burden of proof in any case involving adverse possession is upon the party alleging such, whenever the parties to the action are cotenants and closely related by ties of blood, the burden of the cotenant claiming adversely is intensified. *Chasteen* v. *Chasteen*, 213 So. 2d 509 (Fla. App. 1968); *Walton* v. *Hardy*, 401 S.W.2d 614 (Tex. 1966); *Flunder* v. *Childs*, 238 Ark. 523, 382 S.W.2d 881 (1964). This increased burden usually requires the additional element of "actual knowledge" of the adverse possession, rather than mere circumstances putting the possessor's cotenants on notice. *Baxter* v. *Young*, 229 Ark. 1035, 320 S.W.2d 640 (1959); *Torrez* v. *Brady*, 37 N.M. 105, 19 P.2d 183 (1932). As the court stated in *Mercer* v. *Wayman*, 9 Ill.2d 441, 137 N.E.2d

815 at 818 (1956), a case involving parties with close family relationships:

> While the plaintiffs exercised such control and dominion over the property as to be hostile and adverse to all strangers, the rules with regard to adverse possession are different in the case of one cotenant who claims adversely to other cotenants. . . . Before the possession of one tenant in common can be adverse to the cotenant there must be a disseizin or ouster by some outward act of ownership of an unequivocal character, overt and notorious, and of such nature as to impart information and notice to the cotenant that an adverse possession and disseizin are intended to be asserted by the tenant in possession. . . .
>
> . . . [I]n order to start the running of the Statute of Limitations against a cotenant, it must be shown that the tenant in possession gave *actual notice* to the tenant out of possession that he was claiming adversely, or that the tenant out of possession had received notice of such claim of the tenant in possession by some act which would amount to an ouster or disseizin. . . . [Emphasis added.]

In addition, any cotenant seeking to establish adverse possession labors under a strong presumption against every supposition that a cotenant in sole possession is holding the premises in opposition to the rights of his cotenants. *Hare* v. *Chisman,* 230 Ind. 333, 101 N.E.2d 268 (1951); *Bradford* v. *Armijo,* 28 N.M. 288, 210 P. 1070 (1922). The presumption is that the one in occupancy holds the premises in his character and right as cotenant, and consequently for the others as well as for himself, and not adversely to them. *Smith* v. *Hamakua Mill Co.,* 13 Haw. 716 (1901).

The question we must now answer, then, is whether the

plaintiffs-appellants failed to carry their burden of proof to show intent to hold adversely, or any action of a hostile or adverse nature, or of actual notice of ouster or disseizin against the cotenants, defendants-appellees.

## II. *Adverse Claimants' Proof*

The significant acts upon which appellees have based their claim of adverse possession begin with an application by Harry Haanio for title to Parcel III from the Bishop Estate. As previously mentioned, the Bishop Estate Trustees realized as early as 1909 that the Estate had probably lost some of its land in the Keauhou, Kona region due to encroachments. In 1925 a survey was ordered for this region by Bishop Estate. It showed that Parcel III was one of the many parcels that was subject to loss by adverse possession because of long standing encroachments. To facilitate the "cleaning up" of these encroachments, Bishop Estate attempted to get the encroachers to pay the Estate $100 per acre in return for a quitclaim deed. In the application form for the quitclaim deed to Parcel III, Harry Haanio clearly stated that the interested parties were himself and his sisters Rachael and Alice, that their addresses were unknown and that title to the parcel be in his own name.

The theory of the trial court, in rendering judgment for the appellees, was that the quitclaim of Parcel III within the stonewalls from the Bishop Estate to Harry Haanio was constructive notice to his two sisters and their progeny that he was embarking upon a claim of adverse possession of the whole. Further, since the family dwelling straddles the technical boundary between Parcel I and Parcel III, occupancy of Parcel III as an adverse possessor constitutes adverse possession of Parcels I and II as well. We do not agree.

There are two compelling arguments why such a theory is erroneous. First, there is some doubt as to whether Bishop Estate had any rights in or title to Parcel III at the time they quitclaimed it to Harry Haanio in 1927. Testimony by several witnesses established the fact that Haanio family members lived on the entire premises and used it continuously from 1902, which is as far back as the testimony goes, until some time after 1927. Samuel Haanio lived there until his death in 1909. Then Samuel's half-brother, Charles Punahoa, lived there for "a long time," exactly how long does not appear from the record. Furthermore, Rachael and her husband lived with Punahoa in the large family dwelling for a period of time, again, exactly how long is not clear from the record. Likewise, other members of the family, including Harry Haanio and his wife, Mary, used the premises on weekends whenever they came down from mauka to go fishing at Keauhou Bay. Thus, after careful examination of the record before us, we think the best interpretation that can be given to the events between 1902 and 1927 is that the Haanio family recognized among themselves that the premises belonged to the entire family after Samuel's death. Their continued use, therefore, supports the appellants' argument that the Haanio family had, long prior to 1927, already acquired title to all of the land within the stonewalls by adverse possession. And it follows that when Harry Haanio obtained the quitclaim deed in 1927 he probably received nothing more than what the family already owned.

Secondly, even if we were to assume Bishop Estate had title to give, the law is clear to the effect that the acts of one cotenant in taking a purported conveyance of the land from a stranger and causing the same to be recorded do not as a matter of law constitute in themselves an *ouster* of

the grantee's cotenants or *establish an adverse possession* in them. *Chapin* v. *Stewart,* 71 Idaho 306, 230 P.2d 998 (1951); *Holley* v. *Hawley,* 39 Vt. 525, 94 Am. Dec. 350 (1867). Likewise, a purported conveyance and recording of the same is not in itself *notice* that the cotenant-grantee claims the property exclusively or holds the same adversely even though he is in sole possession. *Barber* v. *McManus,* 205 So.2d 653 (Miss. 1968); *Gilb* v. *O'Neill,* 225 Ala. 92, 142 So. 397 (1932); *Hulvey* v. *Hulvey,* 92 Va. 182, 23 S.E. 233 (1895). The obvious rationale for this rule is that a cotenant out of possession is not in the position of a prospective purchaser or encumbrancer, who naturally must look to the records to see what the title is. He already has title to the interest which he claims and is not bound to suspect that anyone, least of all one of his cotenants, will take that interest from him without his knowledge or concurrence. As the court held in *Gilb* v. *O'Neill, supra,* the recording of instruments did not charge the other cotenants with notice or knowledge that the possessor was claiming the premises adversely to them, for the blood relationships existing between the parties, and the existing relationship between them, "naturally tended to create a feeling of security and repose, rather than to excite vigilance and suspicion, and not until something appeared in the circumstances of the case to suggest overreaching on the part of [the possessor] was a different attitude to be expected on the part of the cotenants...." (142 So. 397 at 402.) The court then went on to stress that the statute authorizing the recordation of instruments and imputing constructive notice therefrom was intended and designed to protect persons dealing with respect to the property described, and should not be made "the vehicle of depriving one tenant in common of his rights by the machinations of another tenant in common, in an effort to cut off

the rights of such other tenants in common *without actual notice.*" (142 So. 397 at 402.)

In view of this well-established rule of law, we find that the trial court erred in its findings when it stated: "Taking the deed and recording it constituted notice to all cotenants and to the world that [Harry Haanio] claimed [Parcel III] as his own." And consequently, the trial court's further finding that since Parcels I and II were used as an entirety with Parcel III and the prime improvement, a house, straddled Parcel I and Parcel III, this constituted notice to said persons of an adverse claim in the entire property, is equally erroneous.

We do not mean to imply or hold that the fact of a deed and the fact that it has been recorded are of no importance. They are matters of evidence bearing on the issues of exclusive claim and adverse possession, and of notice, but they do not in themselves establish notice.

This brings us to the appellees' second main contention as to why they have established exclusive ownership by adverse possession. It is based upon the events that took place after the 1927 deed. For a long period of time, from 1927 to 1942, the property was essentially vacant, the house and grounds being used for the most part by appellant Eliza Nahoeu as a "play-place." Harry and Mary continued to live in their mauka house and used the property on weekends. After Harry died in 1941, his widow decided, in 1942, to live on the property and admittedly she has lived there since that time. But does her sole possession *alone* create title by adverse possession? It appears that nothing is better established than that one cotenant does not hold adversely to the others by mere force of being in sole occupancy of the premises. As this court stated in *Smith* v. *Laamea,* 29 Haw. 750 at 758 (1927):

. . . If the defendant's occupation of the land was permissive in its inception the presumption was that it continued to be of the same nature and the burden was upon the defendant to prove that by words or acts sufficient to give notice to the contrary to an ordinarily prudent and vigilant owner he, the defendant, had changed its character and was thereafter occupying adversely . . . .

To the same effect are *Tagami* v. *Meyer*, 41 Haw. 484 (1956); *Smith* v. *Hamakua Mill Co.*, 15 Haw. 648 (1904); *Dowsett* v. *Maukeala*, 10 Haw. 166 (1895).

To this contention the appellees added further bits of evidence relating primarily to improvements, repairs and taxes. Testimony was adduced that the Harry Haanio family planted trees, ate the fruit, paid the taxes, gathered pebbles and used them to smooth the land, that Mary took down the old, termite-ridden house that was "ready to fall apart" and built a new one, and that people referred to the property as "Mary's place." We must ask, then, whether these additional facts, along with the fact of Mary's sole possession of the property since 1942 meet the burden of proof required of a cotenant seeking to oust other cotenants. We think not. The performance by the possessor of ordinary acts of ownership on or in respect of the land does not establish that the possession is adverse to his cotenants, whether or not they have notice of such acts. Many cases hold that extensive improvements, repairs and payment of taxes made by a cotenant in possession are not inconsistent with cotenancy. *Dimmick* v. *Dimmick*, 58 Cal. 2d 417, 374 P.2d 824, 24 Cal. Rptr. 856 (1962) (sole possession, payment of expenses and improvements are not sufficient to establish ouster of cotenants); *Heiselt* v. *Heiselt*, 10 Utah 2d 126, 349 P.2d 175 (1960) (sole possession, payment of taxes and extensive improvements are

not sufficient to show an intent to oust cotenants); *Moore* v. *Gaines,* 308 Ky. 223, 213 S.W.2d 990 (1948) (possession, payment of taxes and insurance, expensive and extensive repairs do not amount to disseizin of cotenants). In the instant case, the payment of taxes, improvements and construction of a new house to replace one that was "ready to fall apart" were such as a person in possession would normally make for one's own satisfaction and enjoyment and would not necessarily show an intent to oust cotenants of their rights. They are not inconsistent acts of cotenancy. More is needed. There must be some additional element of "actual knowledge" of the adverse possession. All that we have here are circumstances that might possibly put the possessor's cotenants on notice of the adverse claim. This does not amount to notice of ouster or as the *Hamakua Mill* case, *supra,* phrases it, "bringing it home" to the ousted cotenant.

In addition, the trial court gives some weight to testimony from Mary Haanio and her son, Harry, Jr., as to the moving of the stonewalls. Mary testified that a portion of the front wall along the present beach road was moved in 1926 because the county wanted to widen the road and that the wall to the north, along land owned by an adjoining neighbor, was moved "a little bit" around 1932 to take in a small sliver of Award 11046, Apana 2, which had been erroneously excluded from the original stonewalls and was discovered as a result of a modern survey. Also, in 1948, the gate was widened to permit access by a car. Except for these slight changes, the walls were unchanged since the Podmore survey of 1925 and there is no evidence of any changes in the walls prior to that time. We view these acts as being no different in principle from cases where one cotenant acquires an outstanding title. ". . . [A]ny act done by a cotenant for the protection of the common prop-

erty will be presumed to be for the benefit of all tenants and the presumption prevails until the contrary is clearly made to appear." *Sperry* v. *Tolley,* 114 Utah 303, 312, 199 P.2d 542, 546 (1948). Were the law otherwise, one cotenant could craftily maneuver a wall or fence, or permit a stranger to acquire a sliver of the common land, and then use such triumphantly as a weapon to oust his cotenants from the rest of the property.

The trial court's findings of fact as to adverse possession and conclusions of law are clearly erroneous. At no time in the long history of events of this case can it be said that the appellees clearly and unequivocally showed (1) an intent to claim adversely; (2) that there was adverse possession in fact; and (3) that there was "actual knowledge" or notice of the hostile holding brought home to the cotenants out of possession.

Instead, this case can be best described as one in which the heirs of Samuel Haanio and their respective issue, although continuing to recognize that they had some interest in the Keauhou property, were not able to take an active part in the management of the property. Most of the heirs no longer live in the Keauhou, Kona area. And when Mary Haanio moved onto the property in 1942, it is likely that her sisters-in-law, Rachael and Alice, and her nephews and nieces recognized in her a right, as Harry's widow, to live out her remaining years on the family property. In fact, two of Rachael's children admitted that their mother had admonished them to love and care for their Aunt Mary, to allow her to live out her years in peace, and not to pick on her or criticize the condition of the property. Furthermore, Rachael, until her death in 1962, continued to visit the property, staying overnight on occasion, and, as late as 1960, told one Kila McKeague, a witness at the trial, to "go down and stay with Mary; that's the family house." In reality, it was not until the Bishop

Estate had made an offer to buy the property sometime in 1965 or early 1966 that a family dispute as to ownership arose. Even as late as February 3, 1966, Mary Haanio and her children regarded the other family members as co-owners in that they called them in to the Bishop Estate offices that morning to discuss the sale to the Estate. It was shortly after this meeting that Mary Haanio and family would not agree to the sale and the appellants herein, in an effort to get their money out of the property, were advised to bring this action to quiet title.

For the reasons we have set forth, the decree appealed from is reversed. Legal title to the property described herein as Parcels I, II and III is vested in fee in the respective heirs of said Harry Haanio, Rachael Haanio Kaimihana and Alice Haanio Mia. This cause is remanded to quiet title in accordance with this opinion.

Reversed and remanded.

*Howard H. Moore* (*Pratt, Moore, Bortz & Case* of counsel) for appellants.

*Roy K. Nakamoto* for appellees.