985 P.2d 1112

Jolenta Allencastre PETRAN,
Plaintiff–Appellee,

v.

Arnold ALLENCASTRE; Cynthia Allencastre; Stephen P. Allencastre, Defendants–Appellees, Dennis L. Kaluna; Goldie L. Naone, Defendants–Appellants, Hoa; Huluole; Ihu, Kaihe; Kaikala; Kalawaia; Kanoa; Kaulahea; Kawaa; Kawaha; Keonepahu; P. Nui; Palaualelo; Alexa Santos; Alfred Santos; Herbert Santos; Thomas Santos; John Santos; Lawrence Santos; Edwin Santos; Louis Santos; Lionel Santos; Mary Cleveland; Kekee (W), aka Keekee (W); Kaaie (W); Kuewa (K); Henry Wilcomb Cleveland; Manuel D. Amaral, aka Manoel De Amaral, aka Manoel Amaral; Maria De Amaral; Innocencia Da Motta; Bertram Santos Bras; Puhiki (W); Manoel Coito Boteilho; Antone Freitas; William K. Hardey; Bessie G. Hardey; C. Copp, aka Charles Copp; John Da Costa, aka Joao Da Costa, aka Joao De Costa, aka John De Costa; D.W. Mahiole (W); Kahuhu (W), aka Kahuhu Baker; Luukia (W), aka Luukia Kalawaia; Ben Franco; M. Hao Kekapai (K); Takaichi Miyamoto; Kaleionehu (W); Kahuki; Jose Antone, aka Jose Antone Rodrigues, aka Joe Antone; Manuel Antonio Rodrigues, Jose Antonio Rodrigues, Jr.; Frank Antonio Rodrigues; Joao Antonio Rodrigues; Louis Antonio Rodrigues; Maria Rodrigues Santos; Christorina Rodrigues; Antonio Rodrigues; Domingo Antonio Rodrigues; Esabella Rodrigues; Joaquina Rodrigues; Sabina Antonia Rodrigues; Verginia Rodrigues; Samuel Antonio Rodrigues;

546

Frank G. Decosta Vasconcellos; Kalaaunui (K); Antonio Costa Vasconcellos, aka Antone De Costa Vasconcellos, aka Antone Da Costa, aka Antone De Costa; Michael Costa Vasconcellos; Manuel Freitas; Frederick M. Mattson, Patrick P. Mattson; Manuel Coelho; Helen Coelho, aka Helen Kahaleanu Coelho, aka Helen Coelho Kaipo; Malaea (W), aka Mariah Mahiai, aka Mariah Brown, aka Maraea Brown, Kaleiohanu (W); Lillian M. Ah Yat, Hilda M. Rogers, John A. Mattson; Joseph Santos; Michael Santos; Helen Harriet Santos; Margaret Santos; Margaret K. Hardey; Laara Albrett, aka Lorna A.K. Bright; William Groves Hardey, as Trustee of the William Groves Hardey Trust; Rowena B. Hardey, as Trustee of the Rowena B. Hardey Trust; Katherine K. Perry; Mary K. Cunningham; Kuhea Kealoha; Herbert N. Pratt; Vanda Hanakahi; Charles K. Ahlo; Leonard M. Kahuhu; Edna Ellis; Gertrude Namauu; Andrew Hatchie, Sr.; Gordon M. Fernandez; Louisa K. Makaiwi; Charles Pila; Georgina K. Shito; Mahealani Ventura; Momilani Ventura; Doreen Kaluna; George K. Namauu, Jr.; Mele Namauu; Harrideen K. Ambrose; Glenn Ducosin; Lana Ducosin; Office of Hawaiian Affairs; and also the following owners and occupants of adjoining lands as shown on tax maps: Randy A. Ducosin; Deborah Ann Ducosin; Joseph E. Lopes and Mabel R. Lopes, Trustees under the recorded Revocable Living Trust Agreement of Joseph E. Lopes and Mabel R. Lopes dated July 14, 1995; Arnold Allencastre, Jr.; Sharleen Allencastre; Kenneth F. Brittain; William H.P. Davisson, Jr.; Richard Edgar Olaf Olson, Trustee under that certain trust agreement known as the Richard Edgar Olaf Olson Revocable Living Trust dated December 18, 1991, and Leslie Eileen Olson, Trustee under that certain trust agreement known as the Leslie Eileen Olson Revocable Living Trust dated December 18, 1991; Arelai M.C.J. Arian; Catherine H. Hiu; Jay E. Bass, Trustee under Declaration of Trust dated May 2, 1991; Mary M. Evanson; A & B Properties, Inc.; A & B—Hawaii, Inc.; Keith B. Sakamoto; Charlene Sakamoto; County of Maui; State of Hawaii; and all Heirs, Devisees or Assigns of persons named above who are deceased, or persons holding under said Heirs, Devisees or Assigns, and spouses, successors, personal representatives, executors, administrators or trustees of persons named above who are deceased; Does 9 through 100; and all other persons unknown claiming any right, title, estate, line or interests in the subject real property; and To All Whom It May Concern, Defendants.

No. 21787.

Intermediate Court of Appeals of Hawai'i.

Aug. 23, 1999.

As Amended Sept. 1, 1999.

548

Dennis L. Kaluna and Goldie L. Naone, on the briefs, defendants-appellants pro se.

David M. Jorgensen and Paul L. Horikawa (Ing, Horikawa & Kuwada) on the briefs, Wailuku, for plaintiff-appellee.

Debra K. Wright (Wright & Kirschbraun) on the briefs, for defendant-appellee Stephen P. Allencastre.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by ACOBA, J.

We hold that publicly recorded conveyances evidencing the existence of a cotenancy in land may render a cotenant's belief that he or she had no reason to suspect the cotenancy's existence not objectively reasonable under the rule set forth in *City and County of Honolulu v. Bennett*, 57 Haw. 195, 552 P.2d 1380 (1976). Plaintiff–Appellee Jolenta Allencastre Petran (Plaintiff) maintained that as to the land in issue she had no reason to suspect a cotenancy existed with Defendants–Appellants Dennis L. Kaluna and Goldie L. Naone (Naone) (collectively, Defendants) and therefore, under *Bennett,* was excused from giving actual notice of her adverse possession claim to them. However, evidence from publicly filed documents, viewed in a light most favorable to Defendants, suggest a cotenancy may exist among Plaintiff, Defendants, and Defendants–Appellees Arnold Allencastre (Arnold), Cynthia Allencastre (Cynthia), and Stephen P. Allencastre (Stephen) (Arnold, Cynthia, and Stephen are hereinafter collectively referred to as the Allencastres).[1] Accordingly, the June 25,

1. Defendants–Appellees Arnold Allencastre (Arnold), Cynthia Allencastre (Cynthia), and Ste- phen P. Allencastre (Stephen) (collectively, the Allencastres) were defendants only inasmuch as

1998 summary judgment order (the order) and July 1, 1998 judgment of the second circuit court (the court) which in sustaining Plaintiff's claim implicitly concluded otherwise, must be vacated in part.[2] We therefore vacate the order and judgment as aforesaid and remand for a trial on the issue of whether, under the circumstances, Plaintiff had no reason to suspect that a cotenancy with Defendants existed.

We hold, further, that Plaintiff otherwise was entitled to summary judgment on her adverse possession claim and that enforcement of her claim would not violate article XVI, section 12 of the Hawai'i Constitution.

### I.

On March 21, 1997, Plaintiff filed a complaint to quiet title and to partition certain pieces of property containing an aggregate area of 88.096 acres (the Property), located in Kaupakulua, District of Hāmākualoa, Island and County of Maui, State of Hawai'i. The Property is described as a portion of Royal Patent Grant No. 4490 to N. Namauu, containing an area of six acres more or less (the Namauu portion), and as a portion of Royal Patent Grant No. 183 (RPG 183) to William P. Alexander (Alexander), containing an area of 82.096 acres (the Alexander portion). Plaintiff alleged she was the owner of an undivided one-third interest in fee simple in the Property and that the Allencastres were

the owners of the remaining two-thirds fee simple interest. Numerous defendants who could potentially claim an interest in the Property were named. The complaint asserted, alternatively, that Plaintiff acquired title to the Property by deeds, the first dated November 18, 1985, and that Plaintiff and her predecessors in interest had been in actual, open, hostile, notorious, continuous, and exclusive possession of the Property in excess of twenty years prior to November 7, 1978.[3] The complaint sought a judgment, *inter alia*,[4] (1) declaring Plaintiff the owner in fee simple of an undivided one-third (⅓) interest in the Property, (2) barring defendants and all claiming under them from all right, title, and interest in the Property, and (3) partitioning the Property among Plaintiff, the Allencastres, and any other defendants with an established interest in the Property. *See supra* n. 1.

On February 12, 1998, Plaintiff moved for partial summary judgment, claiming that she and the Allencastres owned the Namauu portion by paper title (the partial summary judgment motion).[5] The court granted the partial summary judgment motion on April 9, 1998, ruling that Plaintiff and the Allencastres were the co-owners in fee simple of the Namauu portion of the Property.

On May 7, 1998, Plaintiff moved for summary judgment[6] on the complaint as a whole, claiming that she and the Allencastres owned

---

the complaint sought to partition certain pieces of property containing an aggregate area of 88.096 acres (the Property) between Plaintiff–Appellee Jolenta Allencastre Petran (Plaintiff), the other aforesaid Allencastres, and any other defendants who might have had an interest in the Property.

2. As explained *infra* at note 7, summary judgment in favor of Plaintiff–Appellee Jolenta Allencastre Petran (Plaintiff) for six acres of the land originally in controversy is not challenged on appeal by Defendants–Appellants Dennis L. Kaluna and Goldie L. Naone (collectively, Defendants).

3. Plaintiff apparently claimed that her adverse possession claim matured prior to November 7, 1978 because it was on that date that article XVI, section 12 of the Hawai'i Constitution was adopted. *See infra* text pp. 557–59, 985 P.2d pp. 1124–26.

4. Plaintiff's complaint also sought a judgment determining, "if necessary, the amount of the claims and liens ... of all the defendants[,]" and awarding Plaintiff her attorney's fees and costs.

5. Prior to the filing of Plaintiff's February 12, 1998 motion for partial summary judgment (Plaintiff's partial summary judgment motion), Plaintiff served Defendants with her "First Request For Answers to Interrogatories and Production of Documents." However, Plaintiff's discovery requests and Defendants' responses thereto appear not to have been filed with the second circuit court (the court). Accordingly, references in the briefs to these discovery materials have not been considered on appeal.

6. Plaintiff's May 7, 1998 motion for summary judgment (Plaintiff's summary judgment motion) also included a request for summary judgment against the Office of Hawaiian Affairs (OHA) on separate grounds. Subsequently, OHA disclaimed any interest in the property and is not a party to this appeal.

the Namauu portion by paper title[7] and the Alexander portion by adverse possession, and that the Property should be partitioned among herself and the Allencastres (Plaintiff's summary judgment motion). Defendants opposed Plaintiff's summary judgment motion, arguing they held an interest in the Alexander portion as cotenants with Plaintiff, and that Plaintiff's failure to adequately research the record title was the reason she had not discovered Defendants' interests. Additionally, Defendants maintained that Plaintiff and her predecessors had not established actual, open, notorious, hostile, continuous, and exclusive possession of the Alexander portion for the statutory adverse period.

The court granted Plaintiff's summary judgment motion and on June 25, 1998, issued the order. The order concluded that Plaintiff and the Allencastres "are the owners in fee simple of the entire real property located in Kaupak[u]lua, District of Hamakualoa, Island and County of Maui, State of Hawaii ... which contains 88.055 acres of land, more or less[,]" and directed that the Property be partitioned among Plaintiff and the Allencastres. Judgment was entered thereon on July 1, 1998.

Defendants filed their notice of appeal on July 25, 1998. Defendants' appeal pertains to the order and judgment only insofar as they held that Plaintiff and the Allencastres were the only owners in fee simple of the Alexander portion.[8]

## II.

### A.

The essential facts of this case, as follows, are not in dispute. In RPG 183, a copy of which was attached as Exhibit "B" to Plaintiff's summary judgment motion, a grant of land consisting of "[o]ne [h]undred [and e]ighty [ (180) a]cres more or less[,]" was conveyed by King Kamehameha III to Alexander on December 21, 1849. According to those parts[9] of a First American Title Insurance Company's 1996 title report (the 1996 title report), attached as Exhibit "A" to Plaintiff's partial summary judgment motion, in 1860, the Alexander portion, referred to as "Parcel Second," was conveyed by Alexander to thirteen grantees. Page 111 of the 1996 title report refers to Parcel Second as "[b]eing a portion of [RPG 183] to William P. Alexander, containing an area of 82.096 acres." Page 112 of the 1996 title report states:

AS TO PARTY TWO, PARCEL SECOND

**DEED**

| | |
|---|---|
| Grantor: | W.P. Alexander and wife, Mary Ann Alexander |
| Grantee: | Kanoa, Kaikala, Keonepahu, Kaulahea, Nui, Hoa, Kalawaia, Kawaha, Kawaa, Kaihe, Palauolelo, Huluole and Ihu |
| Dated: | November 21, 1860 |
| Recorded: | December 16, 1861 |
| Book: | 14 |
| Page: | 419 |

(Boldfaced emphasis in original; some underscored emphases added.)

Defendants assert that they are direct descendants of P. Kalawaia, one of the thirteen grantees. Defendant Naone maintains that she is also a direct descendant of Paele Nui, another of the said grantees.

With respect to the conveyance history of RPG 183 itself, Plaintiff alleged in her summary judgment motion that, following the 1860 conveyance, "there were many transfers and exchanges of interests in ... [RPG 183] among ... and between [the grantees] and

---

7. It is unclear as to why Plaintiff sought summary judgment again on that portion of Royal Patent Grant No. 4490 to N. Namauu, containing an area of six acres more or less (the Namauu portion), since partial summary judgment had already been granted as to that parcel; however, the motion requested partition as well.

8. Defendants submit no arguments pertaining to the court's ruling that Plaintiff and the Allencastres were the owners in fee simple of the Namauu portion.

9. While a title report was apparently prepared by First American Title Insurance Company in 1996 (the 1996 title report), Plaintiff claimed that it was unnecessary to file a complete copy of that title report with the court. Instead, portions of the 1996 title report are scattered throughout the record, attached as exhibits to motions and memoranda filed by the parties. Defendants requested that the entire 1996 title report be filed. We believe the entire report should have been made a part of the record and the court should have ordered that done.

other parties[,]" and that "[b]ecause of the imprecise nature of the conveyances of . . . [RPG 183] prior to the turn of the [twentieth] century, much confusion exists as to the manner in which certain transfers of interests . . . occurred."

According to pages 6–7 of the 1996 title report attached as Exhibit B to the opposition memorandum of Defendant Gordon M. Fernandez,[10] in 1868, RPG 183 may have been divided into specific lots and allotted among the thirteen grantees. However, the 1996 report did not locate any document partitioning the land among the thirteen grantees and states as follows:

a) PROBATE NO. 855—SECOND CIRCUIT COURT—"IN THE MATTER OF THE ESTATE OF PALAUALELO AND KAIHE OF MAKAWAO, MAUI, DECEASED"

Filed: September 21, 1870

Said Probate proceedings cite, in part, the following data concerning said Royal Patent Grant No. 183:

1. *That there occurred a first division of the Hui Land between the majority of said Vestees herein named in 1868.*

2. That the proportionate share and the amount paid by each Vestee to be in the following proportion:

| VESTEE | AMOUNT PAID | NO. OF ACRES |
| --- | --- | --- |
| HOA | $ 54.00 | 10.8 |
| HULUOLE | $ 72.00 | 14.4 |
| IHU | $ 43.00 | 8.6 |
| KAIHE | $101.00 | 20.2 |
| KAIKALA | $ 50.00 | 10 |
| KALAWAIA | $ 48.00 | 9.6 |
| KANOA | $ 73.00 | 14.6 |
| KAULAHEA | $ 88.00 | 17.6 |
| KAWAA | $176.00 | 35.2 |
| KAWAHA | $ 47.00 | 9.4 |
| KEONEPAHU | $ 33.00 | 6.6 |
| P. NUI | $ 41.00 | 8.2 |
| PALAUALELO | $ 74.00 | 14.8 |

*That the derivation Deed to said Vestees recorded in Book 14 page 419,*

*does not delineate proportionate shares and/or interests to said Vestees.* However, the amounts paid by each Grantee are given; and

3. *That there are no recorded Partition Deed(s) made by all of said Vestees and/or their Heirs,* although ". . . prior to these proceedings certain parties were evicted from their allotments by a readjustment of the boundary line and that some of the aforenamed Parties[ [11]] have been buying and selling to one another and had it surveyed and passed deeds, the survey was made against the consent of the other Parties . . . [.]"

(Emphases added.) We note that the total number of acres listed in the aforesaid probate proceeding and designated among the thirteen grantees in 1868 amounted to 180 acres, the total acreage of RPG 183. The Alexander portion consists of only 82.096 acres. Thus, the 1996 report apparently concludes, as set forth above, that the same thirteen grantees had an interest in the 82.096 acres of the Alexander portion.[12]

In any event, Plaintiff does not dispute Defendants' contention that the thirteen grantees held title as tenants in common to the Alexander portion.

**B.**

Claiming that the title history of RPG 183 was uncertain, Plaintiff's summary judgment motion focused on (1) the chain of title for the Alexander portion from 1922 to the present and (2) her adverse possession claim.

---

10. Defendant Gordon M. Fernandez did not file a notice of appeal and is not a party to this appeal.

11. That portion of the 1996 title report available does not clarify to whom the word "Parties" refers.

12. While not cited by the parties, we point out that in 1885, the Supreme Court of the Hawaiian Islands held that "[t]he most natural and obvious view would be that where land is conveyed to two or more persons, it was their expectation that it should descend to the heirs of each of them and not to the survivor of them." *Awa v. Horner,* 5 Haw. 543, 544 (1886). Thus, the supreme court rejected the common law preference for joint tenancies and concluded that "such conveyances have been generally understood and treated in this Kingdom as creating estates of tenancies in common, and we ought to hold for the protection and peace of land titles that such is the law of the country." *Id.* Therefore, absent evidence manifesting an intent otherwise, conveyances to two or more persons were presumed to convey tenancies in common.

Hence, Plaintiff refers to a mortgage dated March 17, 1922,[13] which reveals that by then, one Joao DeCosta (DeCosta) had acquired interests from several of the thirteen grantees.[14] However, the record does not indicate how or when DeCosta first obtained such titles.[15]

A January 13, 1998 title report prepared by Security Title Corporation (the 1998 title report) and a deed dated February 7, 1936,[16] disclose DeCosta conveyed "portions of [RPG 183] . . . containing an area of 88.45 acres" to Joe G. Freitas (Freitas). That same year, Freitas "convey[ed the] same" to Peter Allencastre (Peter) and E.J. Allencastre, Jr. (E.J.), Plaintiff's father. Thereafter, in 1938, Peter conveyed his interest to E.J.[17]

In 1949, Makinney & Company (Makinney) prepared a "Certificate of Title" report to the Property (the 1949 title report)[18] in conjunction with a mortgage application by E.J. The 1949 title report, Exhibit M to Plaintiff's summary judgment motion, states:

We hereby certify that we have carefully *examined the indexes of the Clerk of the Supreme Court and Registrar of Conveyances as to the title of* ——

*E.J. ALLENCASTRE, JR.-*

*in and to:-* ——

—— *All of that certain parcel of land* (portion of the lands *described in Royal Patent Grant Number 183 to William P. Alexander and Royal Patent Number 4490, Land Commission Award Number*

*10474, Apana 6 to N. Namauu no M.* Kekuanaoa), situate, lying and being at West Kaupakalua, in the District of Hamakualoa, Island and County of Maui, . . .

*. . . .*

—— *Containing an area of 88.45 acres, or thereabouts.* ——

*. . . .*

Said above described parcel of land . . . being a portion of the same lands that were conveyed to the said PETER J. ALLENCASTRE and E.J. ALLENCASTRE, JR. by JOE G. FREITAS by Deed dated October 20th, 1936 and recorded in said Registry Office in Liber 1351 on Pages 39–41. The interest of the said PETER J. ALLENCASTRE having been by him conveyed to the said E.J. ALLENCASTRE, JR. by Deed dated October 25th, 1938 and recorded in said Registry Office in Liber 1468 on Pages 195–196.

AND WE further certify that there are no liens or encumbrances of whatsoever kind or nature against said title, save and except the following, to-wit:-

—— –TAXES– ——

*. . . .*

—— AND WE *further certify that the legal title to said parcel of land is vested in the said* ——

–E.J. ALLENCASTRE, JR.–

**13.** A copy of this mortgage was attached as Exhibit "D" to Plaintiff's summary judgment motion.

**14.** The record is unclear as to exactly how much of RPG 183 Joao DeCosta (DeCosta) had accumulated by 1922. Defendants maintain that DeCosta acquired approximately seventy acres. On the other hand, a summary of DeCosta's acquisitions apparently prepared by Plaintiff and attached as Exhibit "C" to Plaintiff's summary judgment motion, shows that DeCosta had acquired interests in eighty-nine acres. In any case, Plaintiff claims title by adverse possession, not by paper title.

**15.** The title report prepared by Security Title Corporation dated January 13, 1998 (the 1998 title report), attached as Exhibit "D" to Plaintiff's partial summary judgment motion, described in detail the chain of title for the Namauu portion. Unfortunately, a similar explanation of the Alexander portion's chain of title is not in the record.

**16.** A copy of the deed was attached as Exhibit "F" to Plaintiff's summary judgment motion.

**17.** We note that those portions of the 1996 title report which were made a part of the record do not contain information on conveyances, if any, related to the Property from the 1930's through the 1980's. The only reference in the available portions of the 1996 title report to E.J. Allencastre was as follows: *"NOTE:* Tax Map shows the land under search assessed to: E.J. ALLENCASTRE, JR."

**18.** In Defendants' opening brief, they claim the "Certificate of Title" report prepared in 1949 by Makinney & Company was a search for mortgages and liens. A cursory review of the report, however, states that it "certif[ied] legal title in E.J. Allencastre."

as shown by said Indexes, SUBJECT, HOWEVER, as aforesaid.

IN WITNESS WHEREOF, WE have hereunto set our hand this the NINE-TEENTH day of MARCH A.D. Nineteen Hundred and Forty–Nine (1949), at 9:30 o'clock A.M.

MAKINNEY & COMPANY

(Emphases added.) The first conveyance denoted in the 1949 title report was the one from Freitas to Peter and E.J. in 1936. This report did not disclose the conveyance of the Alexander portion to the thirteen grantees or any subsequent interests in the Alexander portion prior to 1936.

In conjunction with the 1949 title report, Makinney apparently sent a March 31, 1949 letter, included as part of Plaintiff's Exhibit M, to Bishop National Bank of Hawaii at Honolulu. In that letter, Makinney certified that it had conducted a title search and issued a "certificate of title" to E.J.:

We hereby certify that we have carefully examined the Indexes in the Office of the Registrar of Conveyances, FROM AND INCLUDING MARCH 19TH A.D.1949 at 9:30 O'clock A.M. as to the title of

–E. J. ALLENCASTRE, JR.–

in and to:–

The parcel of land described in and covered by the attached Certificate of Title.

AND WE further certify that there are no other or further liens or encumbrances of whatsoever kind or nature against said title, save and except the following, to-wit:–

MORTGAGE. . . .

In 1983, E.J. deeded an undivided one-third interest in the Property to Plaintiff. In anticipation of selling her interest in the Property, Plaintiff obtained the previously-referred-to 1996 title report. Page 3 of the 1996 title report concludes that the Alexander portion is owned by the heirs, devisees, or assignees of the thirteen grantees as tenants in common:

3. The FEE SIMPLE ESTATE interest in [the Property] is owned, at the Commitment Date [ (March 21, 1996 at 8:00 A.M.) ], by

. . . .

PARTY TWO, PARCEL SECOND
[ (the Alexander portion) ]
HEIRS AND/OR DEVISEES AND/OR ASSIGNEES OF,
HOA,
HULUOLE,
B. IHU,
KAIHE,
KAIKALA,
KALAWAIA,
KANOA,
KAULAHEA,
KAWAA,
KAWAHA,
KEONEPAHU,
NUI, aka PAUL NUI, and
PALAUOLELO, . . .
**as Tenants in Common**
SUBJECT TO THE ADMINISTRATION OF THE ESTATES

(Underscored emphases in original; boldfaced emphasis added.)

As the foregoing reports reflect, most of the conveyances were discovered in searches of Bureau of Conveyances records. With respect to the Alexander portion, page 6 of the 1996 title report states that that report sets forth *"THE EFFECT IF ANY OF THE FOLLOWING DOCUMENT(S), ALL RECORDED AT THE BUREAU OF CONVEYANCES OF THE STATE OF HAWAII, UNLESS OTHERWISE NOTED* [.]" (Emphasis in original.)

Despite the apparent lack of a clear chain of title relating back to RPG 183, it appears from the affidavits submitted by Plaintiff, Arnold, and Stephen that no one other than the members of the Allencastre family has used, controlled, or possessed the Alexander portion since 1938. *See infra* pp. 555, 557, 985 P.2d pp. 1122, 1124.

III.

"A summary judgment order is reviewed on appeal under the same standard applied by the trial court." *Tradewind Ins. Co. v. Stout,* 85 Hawai'i 177, 180, 938 P.2d 1196, 1199 (App.), *cert. denied,* 85 Hawai'i 81, 937 P.2d 922 (1997) (citing *State v. Tradewinds*

*Elec. Serv. and Contracting Inc.*, 80 Hawai'i 218, 222, 908 P.2d 1204, 1208 (1995)). "Consequently, we must determine whether viewing all the evidence in a light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party has clearly demonstrated that it is entitled to judgment as a matter of law." *Id.*; Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c); *Pioneer Mill Co. v. Dow*, 90 Hawai'i 289, 295, 978 P.2d 727, 733 (1999). However, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." HRCP Rule 56(e).

### IV.

On appeal, Defendants argue that the court erred in granting Plaintiff's motion for summary judgment because (1) disputes exist as to whether (a) Plaintiff was required to give Defendants actual notice of her adverse possession claim during the statutory period and (b) Plaintiff's use of the Alexander portion was "open, hostile, notorious, actual, continuous[,] or exclusive" and (2) Plaintiff's adverse possession claim violates article XVI, section 12 of the Hawai'i Constitution.

### V.

Defendants maintain that they are cotenants with Plaintiff as to the Alexander portion and, as such, they were entitled to actual notice of the adverse possession claim before the statutory period may begin to run. On appeal, Plaintiff does not dispute that Defendants are heirs to some of the thirteen grantees or that a cotenancy exists as among the parties. Instead, Plaintiff argues that Plaintiff was excused from actually notifying Defendants that she was claiming adversely to them because she and her predecessors had no reason to suspect that a cotenancy existed.[19]

### A.

The Hawai'i Supreme Court has pointed out that "[b]ecause each cotenant is

entitled to possession of the entire cotenancy property, and because each cotenant is said to enter on behalf of all cotenants, it has always been difficult to determine when ... [an] action first accrues in cotenancy cases." *Bennett*, 57 Haw. at 206–07, 552 P.2d at 1389. In such cases, then, "the specific issue is the degree of notice, whether actual or constructive, which must be received by the cotenant out of possession before ... [the] right of action is said to accrue." *Id.* at 207, 552 P.2d at 1389. Citing *Yin v. Midkiff*, 52 Haw. 537, 481 P.2d 109 (1971), where the "requirement of actual notice or actual knowledge [is required] when a cotenant claims adversely against a blood-related cotenant[,]" *Bennett*, 57 Haw. at 207, 552 P.2d at 1389, the supreme court chose to extend the *Yin* rule to non-related cotenants. Eschewing "the unduly facile acquisition of title by adverse possession[,]" *id.* at 208, 552 P.2d at 1389, the court observed "that a tenant in common shares a general *fiduciary relationship* with his cotenants, which relationship may require the tenant in possession to give his cotenants actual notice of an adverse claim[.]" *Id.* at 208–09, 552 P.2d at 1390 (emphasis in original). The supreme court thus adopted the following rule:

> [B]ecause of the general fiduciary relationship between cotenants, a tenant in common claiming by adverse possession must prove that he [or she] acted in *good faith* towards the cotenants during the statutory period. In most circumstances, this requirement of good faith will in turn mandate that the tenant claiming adversely must *actually notify* his [or her] cotenants that he [or she] is claiming against them. In the following exceptional circumstances, however, good faith is satisfied by less than actual notice: where the tenant in possession has *no reason to suspect* that a cotenancy exists; or where the tenant in possession makes a *good faith, reasonable effort to notify* the cotenants but is unable to locate them; or where the tenants out of possession already have *actual knowledge* that the tenant in possession is claiming

---

19. On appeal, Plaintiff and Stephen filed a joint answering brief. However, Plaintiff was the only party to raise the adverse possession claim be-

low. We refer only to Plaintiff in the text. Neither Arnold nor Cynthia filed a brief connected to this appeal.

adversely to their interests. <u>In these limited circumstances, the notice requirement will be satisfied by constructive notice and "open and notorious possession."</u> *Id.* at 209–10, 552 P.2d at 1390 (italicized emphases in original; underscored emphases added).

■ In applying the foregoing rule, the fact, if established, that Plaintiff and her "predecessors were totally ignorant of [the cotenancy]" would not absolve them of the notice requirement. *Id.* at 210, 552 P.2d at 1391. Rather, "the standard of good faith includes an objective requirement of *reasonableness*, in addition to a subjective requirement that the claimant believe[s] himself [or herself] to be the sole owner." *Id.* at 210–11, 552 P.2d at 1391 (emphasis in original). Thus, under the exception chosen by Plaintiff, she was obligated to prove "that there had been *no reason* for the tenants in possession ([Plaintiff] or [her] predecessors) to suspect the existence o[f] a cotenancy[.]" *Id.* at 211, 552 P.2d at 1391 (emphasis in original). "Whether or not [such persons] believed that there was no cotenancy .. would be [a] question[ ] for the trier of fact, to be decided in light of all the facts and circumstances of the case." *Id.* While "the existence or nonexistence of color of title is one factor for the jury to consider in evaluating whether a party in possession reasonably believed himself [or herself] to be sole owner[,] ... evidence that the cotenant in possession knew or *ought to have known* that there existed a cotenancy ... would go towards justifying a finding of bad faith, assuming that the cotenants did not already have actual knowledge of the adverse claim." *Id.* (emphasis added).

In sum, the burden is on the claimant "affirmatively to adduce evidence that there was 'no reason to suspect that a cotenancy exist[ed].'" *Morinoue v. Roy*, 86 Hawai'i 76, 83, 947 P.2d 944, 951 (1997) (quoting *Bennett*, 57 Haw. at 209, 552 P.2d at 1390).

### B.

Plaintiff purports to have adduced evidence that she personally had no reason to suspect a cotenancy. Paragraph 14 of Plaintiff's affidavit averred, "I have never had any reason to believe that any claim to the [Alexander portion] by anyone other than members of our family has existed since 1938." Paragraph 16 of Plaintiff's affidavit stated that "no one has ever approached [her] to discuss ownership of the [Alexander portion], and that to the best of [Plaintiff's] knowledge, no one claiming an interest in this case has ever even visited the [Alexander portion]." As previously indicated, Plaintiff relies, in part, on a copy of the 1949 title report which certified that E.J. was the sole owner of the Property.

Assuming *arguendo* that the foregoing satisfied the subjective requirement that Plaintiff believed she and the Allencastres were the sole owners of the Alexander portion, there remains a question as to whether her lack of suspicion was objectively reasonable.

### C.

■ Plaintiff implicitly acknowledges that there were breaks in the chain of title to the Alexander portion in the record which have not been explained. This court has previously stated under analogous circumstances that

> breaks ... in chains of record title provide[ ] "reason to suspect" the existence of one or more cotenancies[ and t]he fact that [plaintiff] had assured itself that it and its predecessors in interest had occupied the land for at least 50 years and [that] there were no known claimants nor any likelihood of potential claimants to the [p]roperty including possible tenants in common does not satisfy *Bennett's* notice requirements.

*Kipahulu Inv. Co. v. Seltzer Partnership*, 4 Haw.App. 625, 629, 675 P.2d 778, 782 (1983), *cert. denied*, 67 Haw. 685, 744 P.2d 781 (1984).

Certainly, the 1949 title report would not support an objectively reasonable belief that Plaintiff had no cotenants. The report did not set out the chain of title for RPG 183. The only conveyances listed in the 1949 title report were the 1936 conveyance from Freitas to Peter and E.J. and the 1938 conveyance from Peter to E.J. Thus, on its face, the 1949 title report was an incomplete title history of the Alexander portion. The record

does not reveal any update of the 1949 report preceding 1996.

Furthermore, the 1996 title report uncovered Alexander's conveyance of RPG 183 to the thirteen grantees in a document which appears to have been recorded in the Bureau of Conveyances in 1861. The same title report discovered a "derivation Deed" of the 1868 conveyance recorded in the Bureau, although the filing date thereof is not clear. Finally, based in major part on such recorded documents, the 1996 title report concluded that the successors of the thirteen grantees hold fee simple interests in the Alexander portion as cotenants.

 Under *Bennett,* "a finding of bad faith" may be inferred from evidence that the "cotenant in possession ... *ought to have known* that there existed a cotenancy." 57 Haw. at 211, 552 P.2d at 1391 (emphasis added). In our view, a cotenant in possession ought to have known of a cotenancy if evidence thereof existed in the Bureau of Conveyances. Therefore, if the 1860 conveyance of RPG 183 to the thirteen grantees or subsequent conveyances were a matter of public record at any relevant time, that fact would weigh against a finding that Plaintiff's belief in the non-existence of a cotenancy was objectively reasonable.[20] The recording of deeds ensures that the public, including Plaintiff and her predecessors, would be afforded notice of the property interests detailed therein and of potential claims to the property. Deeds serve as notice "to those who are bound to search the record." *In re Nelson,* 26 Haw. 809, 820 (1923).

 We conclude that under these circumstances, there remain genuine issues of material fact as to whether Plaintiff and her predecessors had no reason to suspect the existence of a cotenancy. Accordingly, the case must be remanded for a trial on that issue.[21]

In addition, on remand, we instruct that Plaintiff make known the dates on which she claims her adverse possession claim began and ended.[22] This period must be established in order to identify the period during which any relevant public record would have given Plaintiff or her predecessors reason to suspect or know of a cotenancy. Failing proof that she or her predecessors had no reason to harbor the requisite suspicion, the statutory period for Plaintiff's adverse possession claim would not have begun to run before November 7, 1978. *See* discussion *infra.*

### VI.

We address the other points raised by Defendants in the event that following remand, Plaintiff satisfies the cotenant notice requirements established in *Bennett.*

### VII.

Defendants argue that Plaintiff failed to establish that her use of the property was "open, hostile, notorious, actual, continuous[,] or exclusive for any statutory period."

### A.

 In order to establish title to real property by adverse possession, a claimant "must bear the burden of proving by clear and positive proof each element of actual, open, notorious, hostile, continuous[,] and exclusive possession for the statutory peri-

---

20. Since at least 1925, the superintendent of the Bureau of Conveyances has been referred to as the "registrar of conveyances." *See* Revised Laws of Hawai'i (RLH) 1925, § 3124, RLH 1935, § 5110; RLH 1945, § 12710; RLH 1955, § 343–1; Hawai'i Revised Statutes (HRS) § 502–1 (1993). The registrar of conveyances's duties include the recordation of all the deeds and instruments filed with the bureau of conveyances and creation of an index for public search of those records. *See, e.g.,* RLH 1945, § 12714; RLH 1955, § 343–5, HRS § 502–11 (1993). Thus, it would appear that the reference to the search of the "[I]ndex in the Office of the Registrar of Conveyances" in the 1949 title report

should have included a search of the records at the Bureau of Conveyances as we think of it today.

21. Moreover, because of the seeming incomplete nature of the title reports before us, we are reluctant to dispose of this case on appeal.

22. Although Plaintiff and Stephen assert that they have possessed adversely "since 1938," they do not indicate when they claim the relevant statutory adverse period specifically began or ended.

od." [23] *Lai v. Kukahiko,* 58 Haw. 362, 368–69, 569 P.2d 352, 357 (1977) (citations omitted).

 Actual, open, and notorious possession is established where a claimant shows " 'use of the land to such an extent and in such a manner as to put the world on notice' by means 'so notorious as to attract the attention of every adverse claimant.' " *Morinoue,* 86 Hawai'i at 82, 947 P.2d at 950 (quoting *Cheek v. Wainwright,* 246 Ga. 171, 269 S.E.2d 443, 445 (1980)). "The element of hostility is satisfied by showing possession for oneself under a claim of right[,]" and "[s]uch possession must import a denial of the owner's title." *Okuna v. Nakahuna,* 60 Haw. 650, 656, 594 P.2d 128, 132 (1979). Finally, continuity and exclusivity of possession require that the "adverse possessor's use of a disputed area . . . rise to that level which would characterize an average owner's use of similar property." *Tenala, Ltd. v. Fowler,* 921 P.2d 1114, 1119 (Alaska 1996). Accordingly, infrequent visits to a property will not suffice to establish continuity and exclusivity of possession. *Okuna,* 60 Haw. at 656, 594 P.2d at 132. At the same time, one claiming by adverse possession does not necessarily have to reside or be physically present on property. *Alaska Nat'l. Bank v. Linck,* 559 P.2d 1049 (Alaska 1977); *Fritts v. Ericson,* 103 Ariz. 33, 436 P.2d 582 (1968).

### B.

The evidence as to the extent and nature of the Allencastres' possession is derived primarily from the affidavits of Plaintiff, Arnold, and Stephen. Each of these affidavits maintains that E.J. built a slaughterhouse on the Alexander portion in 1938 and that the Allencastres or their lessees operated a slaughterhouse and meat-packing family business there until 1992. The affidavits also allege that since 1938 the Allencastre family has "worked the land, planted special grasses, tilled, fertilized and weeded the land, constructed, maintained and repaired the fences[ [24]] around the entire Property,[ [25]] [and] raised cattle for public consumption[.] Plaintiff's and Arnold's affidavits related that since 1938, signs were posted at the entrance to the Property identifying it as the location of the "Allencastre Slaughterhouse."

Defendants maintain that neither Plaintiff nor her predecessors have ever been listed in state directories or records at the State Archives as residing at an address corresponding to the Alexander portion. However, Plaintiff asserted that the Allencastre family had constructed and used buildings on the Alexander portion, and Arnold and Stephen confirmed that "various members of [the Allencastre] family have had residences" there since at least 1945. Plaintiff maintained that she "spent [her] childhood on the Property[,] . . . [and] personally used the property from 1954 to the present[.]" Since 1938, the Allencastre family has paid the taxes on the Property. Also, Plaintiff, Arnold, and Stephen declared that "no one has ever approached [them] to discuss the ownership of the Property[.]"

23. The statutory period for establishing title to real property by adverse possession was ten years between 1898 and 1973. *Morinoue v. Roy,* 86 Hawai'i 76, 81 n. 6, 947 P.2d 944, 949 n. 6 (1997) (citing *Lai v. Kukahiko,* 58 Haw. 362, 367 n. 4, 569 P.2d 352, 356 n. 4 (1977) (citing 1898 Haw. Sess. L. Act 19)). Although the period was extended to twenty years in 1973, this change did not affect "rights that had already matured" prior to that date. *Id.* (citing *Lai,* 58 Haw. at 367 n. 4, 569 P.2d at 356 n. 4 (citing HRS § 669–1(b) (Supp.1975) and 1973 Haw. Sess. L. Act. 26 § 6, at 32)). Therefore, to have established a prima facie case of adverse possession, Plaintiff was required to show that the elements of adverse possession had been satisfied for either a ten-year period between 1938 (when Plaintiff alleged the Property was fenced off and the Allencastre slaughterhouse built) and 1973 or for a twenty-year period on a claim brought after 1973.

24. In their opening and reply briefs, Defendants contend that the Property was actually fenced off "at least before 1925," rather than in 1938 as averred by Plaintiff, Arnold, and Stephen. However, Defendants' briefs, answers, memoranda, and affidavits fail to set forth specific facts that would support this claim. In any case, Defendants do not deny that the Allencastre family repaired and maintained fences from 1938 to the present and erected a sign at the entrance to the Property indicating that it was controlled by the Allencastre family.

25. In their affidavits, Plaintiff, Arnold, and Stephen repeatedly referred to "the Property" as a whole, rather than just the Alexander portion. It is clear, however, that the affiants included the Alexander portion in their description of "the Property."

## C.

We regard the operation and leasing of a slaughterhouse for over fifty years and the existence of signs identifying the land as the location of the "Allencastre Slaughterhouse" for the same time period as demonstrating "use of the land to such an extent and in such a manner as to put the world on notice[.]" *Morinoue*, 86 Hawai'i at 82, 947 P.2d at 950 (internal quotation marks and citation omitted). Similarly, we consider the placement and maintenance of fences and the erection of a sign showing the Property was controlled by the Allencastre family as proof that Plaintiff and her predecessors "possess[ed the land] under a claim of right" in such a way as to deny the title owner's right. *Okuna*, 60 Haw. at 656, 594 P.2d at 132. We therefore conclude that Plaintiff met her burden of demonstrating that possession of the Alexander portion was hostile as well as actual, open, and notorious.

Moreover, by averring intermittent residence, continuous business operations, the raising of livestock, and maintenance of the grounds, we recognize Plaintiff has shown that her and her predecessors' use of the property rose to the "level that would characterize an average owner's use of similar property." *Tenala, Ltd.*, 921 P.2d at 1119. The allegations contained in Plaintiff's affidavits were therefore sufficient to show continuity and exclusivity of possession.

Defendants appear to argue that Plaintiff has not met the continuity element because the Allencastres have never been listed as residents of an address that corresponds to the Alexander portion. Even if they were not so listed, the allegation that Plaintiff has not resided continuously on the Alexander portion does not preclude her from showing continuity of *possession*. As noted above, Plaintiff and her predecessors have substantiated such possession by their extensive use of the land.

We therefore conclude that Plaintiff established a prima facie case of adverse possession. On the other hand, Defendants failed to set forth specific facts that would raise a question as to whether Plaintiff's possession was actual, open, notorious, hostile, continu-ous, and exclusive. Other than questions raised by the cotenant notice requirements set forth in *Bennett*, there are no genuine issues of material fact as to Plaintiff's proof of adverse possession.

## VIII.

### A.

Finally, Defendants argue that article XVI, section 12 of the Hawai'i Constitution "bars Plaintiff from acquiring any interest in the property by the application of the doctrine of adverse possession." Article XVI, section 12 of the Hawai'i Constitution states:

> *No person shall be deprived of title to an estate or interest in real property by another person claiming actual, continuous, hostile, exclusive, open and notorious possession of such lands, except to real property of five acres or less.* Such a claim may be asserted not more than once in twenty years."

(Emphasis added.) As set forth previously, the Alexander portion exceeds five acres. Plaintiff argues that the foregoing section is inapplicable to this case because it was not intended to apply retroactively to claims that matured before its adoption on November 7, 1978. In her answering brief, Plaintiff maintains that she and Stephen "and/or their father have been in actual, open, notorious, hostile, continuous[,] and exclusive possession of the Property since at least 1938, much longer than the minimum required by [Hawai'i Revised Statutes (HRS)] § 669–1(b) [ (1993) ]."

### B.

We agree with Plaintiff that article XVI, section 12 does not bar adverse possession claims which matured prior to November 7, 1978. The "'fundamental principal in construing a constitutional provision is to give effect to the intentions of the framers and the people adopting it.'" *State v. Miyasaki*, 62 Haw. 269, 281, 614 P.2d 915, 922 (1980) (quoting *Hawaii Gov't Employees Assn. v. County of Maui*, 59 Haw. 65, 80–81, 576 P.2d 1029, 1039 (1978)). When an amendment appears ambiguous, appellate courts may consult extrinsic aids to deter-

mine the intent of the framers and of those who adopted the amendment. *State v. Kahlbaun*, 64 Haw. 197, 201–202, 638 P.2d 309, 314 (1981). To this end, the debates, proceedings, and standing committee reports of the Constitutional Convention will often be useful.[26] *Id.* at 204, 638 P.2d at 316; *See also Pray v. Judicial Selection Comm'n*, 75 Haw. 333, 343, 861 P.2d 723, 728 (1993). In addition, the court may look to the "legislative implementation" of the amendment to ascertain the intent of the amendment's framers. *Kahlbaun*, 64 Haw. at 202, 638 P.2d at 314 (citing *Hawaii Gov't Employees*, 59 Haw. at 80–81, 576 P.2d at 1039).

### C.

 The text of article XVI, section 12 does not expressly set forth the framers' intent as to its prospective or retroactive application. However, our examination of the 1978 Constitutional Convention records reveals that the adverse possession provision was to be prospectively applied. Such an understanding is plainly evidenced in the following excerpt from a standing committee report:

> Some members argued that without adverse possession, perfection of titles by Hawaiians who have lived on the land for many years would be impossible. Under this proposal this would not be a problem. Thus your Committee determined that this section be *prospective in nature and that all claims that have already matured under present statutes and common law are recognized.*

Stand. Comm. Rep. No. 57, in Proceedings of the Constitutional Convention of Hawai'i of 1978, at 640 (1980) (emphasis added).

HRS § 669–1(b) indicates that the legislature also understood the restrictions on adverse possession claims to be prospective in nature. HRS § 669–1(b) states, in relevant part:

> Action for the purpose of establishing title to a parcel of real property of *greater*

*than five acres may be brought by any person who had been in adverse possession of the real property for not less than twenty years prior to November 7, 1978, or for not less than earlier applicable time periods of adverse possession.*

(Emphasis added.) The purpose of HRS § 669–1(b) was "to conform the [HRS] to section 12 of [a]rticle XVI of the Hawaii Constitution." Conf. Comm. Rep. No. 57, in 1979 House Journal, at 1111. In that regard, HRS § 669–1(b) was "drafted to be applied prospectively. Accordingly, where adverse possession of twenty years had matured previous to the voters' ratification of [article XVI, section 12] on November 7, 1978, such claim could still be enforceable." *Id.*

 In light of the proceedings of the 1978 Constitutional Convention, we believe HRS § 669(b) to be a reasonable construction of article XVI, section 12. *See Hawai'i Gov't. Employees*, 59 Haw. at 88, 576 P.2d at 1043 (observing that "where legislative construction of a constitutional amendment is reasonable, the courts will ordinarily follow the legislative construction"). We therefore conclude that the Hawai'i Constitution does not bar Plaintiff from bringing an adverse possession claim to more than five acres of land where the claim matured prior to November 7, 1978.

### IX.

Based on the foregoing, we vacate the court's June 25, 1998 order granting Plaintiff's motion for summary judgment and the July 1, 1998 judgment entered thereon only as to the Alexander portion and the partition thereof, and remand for proceedings consistent with this opinion.

---

26. "Such evidence, however, 'does not have binding force on this [appellate] court and its persuasive value depends on the circumstances of each case.'" *Pray v. Judicial Selection Comm'n*, 75 Haw. 333, 343, 861 P.2d 723, 728 (1993) (quoting *State v. Kahlbaun*, 64 Haw. 197, 204, 638 P.2d 309, 316 (1981)).